## COSSACK v. UNITED STATES.
### No. 6947.

Circuit Court of Appeals, Ninth Circuit.
Feb. 13, 1933.

A. L. Wissburg, of San Bernardino, Cal., for appellant.

Samuel W. McNabb, U. S. Atty., and John R. Layng, Asst. U. S. Atty., both of Los Angeles, Cal.

Before WILBUR, SAWTELLE, and MACK, Circuit Judges.

SAWTELLE, Circuit Judge.

Alexander Faerstein conducted a retail clothing store and haberdashery in San Bernardino, Cal. On December 26, 1930, he consulted with the defendant-appellant, an attorney, as to Faerstein's financial difficulties. As a result of that conference, it was decided to execute an assignment for the benefit of Faerstein's creditors, which was done on that same day. Faerstein brought his books with him to the appellant's office, where they remained from December 26, 1930, to January 2, 1931.

The defendant-appellant, as member of the firm of Cossack & Krumm, mailed out a form letter to all creditors of Faerstein, stating that the assignment had been made and requesting the consent of the creditors thereto. Later, the appellant met about a dozen of the creditors, and was notified that they would not accept the appellant's father, R. H. Cossack, as the assignee, and that they would file an involuntary petition in bankruptcy on the afternoon of that day; namely, December 31, 1930. The creditors' petition was filed on the date announced, in the United States District Court for the Southern District of California. On the same afternoon, one of the same creditors filed a petition for the appointment of a receiver.

On the same day, the District Judge signed an order appointing William H. Moore, Jr., receiver. The next court day, January 2, 1931, the receiver furnished his agent, James E. Price, with a certified copy of the order appointing the receiver, together with a certificate designating Price as the representative of the receiver. Accompanied by the witnesses, E. O. Demming and J. A. Poole, Price arrived at San Bernardino some time between 1 and 2 p. m., on January 2d.

They found the bankrupt's store in the charge of the appellant's father, R. H. Cossack, as assignee, who turned over to Price all the bankrupt's assets in the store. Price also made a demand for the books, and R. H. Cossack replied that they were in his son's office. The elder Cossack then went to his son's office, at about 4:40 p. m., and, according to his testimony, demanded of Theodore G. Krumm, at that time the appellant's law partner, that Faerstein's books be turned over, in obedience to the court order. Krumm prepared a receipt for Price to sign, and went to the store with R. H. Cossack, between 3 and 5 o'clock that afternoon. At the store, Price asked Krumm where the books were, and Krumm, according to Krumm's testimony, replied that he did not know. Price refused to sign the receipt that Krumm had prepared.

According to his testimony, Krumm went over to the courthouse to see the appellant that same afternoon, though Krumm stated

on the stand that he was "not quite positive" that he did so. Cossack was "busily engaged in the trial" of a case, and Krumm spoke only a few words to him, according to the latter's testimony. Continuing, Krumm testified: "[I] informed him of the fact that a receiver was there, and that I went over. I believe all he said [was that] he would be over and take care of the matter. I did not relay the message to any one. I did not see Mr. Cossack any more that day. I think I saw him a day or two later."

In that connection, it may be observed that Krumm testified he went to the courthouse "some time approximately in the latter part of the afternoon, before 5 o'clock." Fred W. Watkins, the reporter in the court where the appellant had been trying a criminal case on the afternoon in question, testified that the jury was ordered to retire for its deliberations at 3:35 p. m. on that day. The appellant denied on the stand that he saw "Krumm that day at all."

Attempting to summarize the testimony on this point, the lower court, in its instructions to the jury, said in part:

"Mr. Krumm says that he went over after awhile. * * * Mr. Krumm, however, while he said he thought he did, but rather gave it in such a detailed way that I take it he meant to testify that he did go over and tell Mr. Cossack that the receiver was there for the books. Mr. Cossack said to him, 'I will attend to it.' Now, gentlemen, was that information communicated to Mr. Cossack? He denied it. He says it was not. * * *

"In other words, is it likely that the young man Krumm was not telling a straight story, because if he is, so far as I can see, there is not very much left to the case. He says in [a] kind of a halting way that he is not sure, but then, you will remember the testimony, after that, quite definite, to the effect of what he did over there. If he is not sure that he went there, I fail to see what he could relate, that took place after he got there."

As will be seen, the question of whether or not Krumm communicated with his law partner, the appellant, is important as bearing upon the question of the appellant's knowledge that a receiver desired the books which the appellant that evening, according to his own statement, turned over to the bankrupt, so that the latter might prepare a summary of the assets for the appellant.

The appellant testified that after the case went to the jury he waited in the courtroom until 6 o'clock that evening, and then went to his office, and thence to his home; that shortly after 7 o'clock Faerstein called him on the telephone and said that he wanted to get the books in order to make the summary already referred to herein; that he went to his office with Faerstein; that Faerstein then suggested "he had better get something in which to get the actual books in"; that they accordingly drove to Faerstein's apartments, where the bankrupt procured a suitcase; that, in company with Edward J. Seaman, a brother-in-law of Faerstein, he and Faerstein drove to the appellant's office; that Faerstein took all of his books, and gave the appellant a receipt therefor; and that Faerstein then drove the appellant back to the latter's home, "some time after eight."

The appellant further testified that upon his arrival, he was informed by his father that Faerstein "had been thrown into bankruptcy," and that the elder Cossack had promised to get the bankrupt's books from the appellant, and deliver them to the receiver. The appellant also stated on the stand that he "didn't know about the petition having actually been filed," until he reached home "at about eight."

On direct examination, the appellant stated that about a half hour after Faerstein left him "at the office," on the same night of January 2, 1931, Faerstein returned to the appellant's house, and the following occurred:

"So Mr. Faerstein came back there and told me and related the story to me that after he left me at the house he drove downtown with Mr. Seaman. He parked his car at Third Street, went to the Goodfellows' Café, and left Seaman off at that point.

"He went into the Goodfellows' Café to get something to eat, and that when he returned to his car, the suitcase, scarf, and gloves was stolen out of the car. I asked him, 'Did you report that to the police?' He said that he had. I says, 'Well, do you know that you were put into bankruptcy?' 'No, I don't know.' 'Well,' I says, 'when I arrived home, Dad told me that the receiver was appointed.' "

Before the referee in bankruptcy, the appellant testified as follows: "I don't think I ever informed the Receiver about the theft of the books. * * * If the receiver or his agent had gotten in touch with me I would have informed them about it, but they did not do it."

On January 8, 1931, Faerstein filed in the District Court an affidavit of bankruptcy consenting to adjudication, and on the same day he was adjudicated a bankrupt. On Febru-

ary 5, 1931, the referee, on petition of the trustee, issued an order to show cause why the bankrupt, his attorneys, Cossack & Krumm, and R. H. Cossack, the assignee, should not turn over to the trustee "all of the books [and papers] of the bankrupt now concealed by them," [according to the trustee's petition]; why the assignee should not account to the trustee for cash amounting to $2,038.72; and why the appellant herein should not forthwith turn over to the trustee $300 collected by him from the San Bernardino National Bank on December 27, 1930.

Testimony on the proceedings to show cause was taken on February 10, 11, 12, and 13, 1931, and on March 11, 1931, the referee filed findings of fact, conclusions of law, and an order requiring the two Cossacks and Faerstein to turn over to the trustee certain books and papers belonging to the bankrupt; requiring R. H. Cossack to turn over $1,912.-50 to the trustee; and requiring the appellant herein to turn over the $300 referred to above.

On petition of the appellant herein, R. H. Cossack and the bankrupt, the referee on March 20, 1931, entered an "order to reconsider," annulling the turnover order of March 11th, and ordering that a further hearing upon the order to show cause be had on April 8, 1931. On March 23, 1931, the trustee filed a petition for review of the order to reconsider, and on June 13, 1931, the court below reversed the referee's order to reconsider. On May 16, 1932, this court affirmed the order of the District Court. In re Faerstein, 58 F.(2d) 942.

On July 22, 1931, the two Cossacks and the bankrupt were indicted on a charge of conspiracy to violate section 29b of the Bankruptcy Act (11 USCA § 52 (b), which provides in part: "§ 52. * * * (b) A person shall be punished, by imprisonment for a period not to exceed two years, upon conviction of the offense of having knowingly and fraudulently (1) concealed while a bankrupt, or after his discharge, from his trustee any of the property belonging to his estate in bankruptcy. * * *"

Faerstein and the appellant were found guilty, and R. H. Cossack was acquitted. Faerstein has not joined in this appeal.

The appeal has been presented to this court in forma pauperis, and both the record and the appellant's brief leave much to be desired in the matter of form. Nowhere in the appellant's brief, for example, is there to be found even an attempt at a succinct and connected statement of facts. Many of the documentary exhibits, furthermore, are fastened together without separate numeration, a circumstance which, in view of the frequent reference to them made necessary by the confused condition of the record, has added considerably to the labors of this court.

While there are portions of the bill of exceptions in which there is unnecessarily set forth the testimony in detail, some of the evidence is indeed presented in narrative form. Much more of the bill, however, could have been prepared in that manner. The bill of exceptions consists of 329 typewritten pages, in addition to more than 100 pages of pleadings, assignments of error, minutes, orders, and the like—all stapled into one unwieldy bale of papers denominated "Transcript of Record," aggregating 465 pages.

In settling the bill of exceptions, the District Judge, on August 8, 1932, announced that he did so "with some reluctance," and referred to the "attempted amendment to the assignment[s] of error containing some 96 attempted specifications of error," which had been filed and served on the Assistant United States Attorney on May 31, 1932.

Such methods of preparing assignments of error and bills of exceptions have been condemned by the Supreme Court. In Louisville & Nashville R. R. v. United States, 238 U. S. 1, 11, 35 S. Ct. 696, 698, 59 L. Ed. 1177, where the record had been properly prepared, the court observed: "The practice is also in compliance with the spirit of the new equity rules (75–77 [28 USCA § 723]) which call for just such a winnowing out of the useless; the presentation of only the relevant parts of exhibits, documents, tables, and reports, the elimination of all reduplications in written and oral testimony, and a condensation into narrative form of what is material to the then issue before the court."

Such a "winnowing" is also called for by rule 10 of this court, which also provides that "no bill of exceptions shall be allowed on a general exception to the charge of the court to the jury in trials at common law." In this connection, we wish to advert to the following colloquy between the court and defense counsel at the close of the instructions given in the instant case:

"Mr. Moore. Now, I have no further exceptions, your Honor, with the exception that I want to reserve the general exceptions to cover such matters as I might find not covered by the specific instructions.

"The Court. All right.

514

"Mr. Moore. I simply reserve the general exceptions.

"The Court. Very well."

The importance of this rule against general exceptions was emphasized by this court in the recent case of Howland v. Beck, 56 F. (2d) 35, 36, 37.

On the subject of multiplicity of assignments, the Supreme Court, in Central Vermont Ry. v. White, 238 U. S. 507, 508, 509, 35 S. Ct. 865, 866, 59 L. Ed. 1433, Ann. Cas. 1916B, 252, said: " * * * The case was brought here on a record containing so many assignments, covering 18 printed pages, as to make it proper to repeat the ruling in Phillips & C. Constr. Co. v. Seymour, 91 U. S. 648, 23 L. Ed. 341, 342, that the 'practice of filing a large number of assignments cannot be approved. It perverts the purpose sought to be subserved by the rule requiring any assignments.' "

We cannot and do not approve of these methods of preparing bills of exceptions and assignments of error, even in cases where, as here, the appeal is prosecuted in forma pauperis.

· Nevertheless, since there was some attempt to condense the testimony into narrative form, we will consider this case on the merits—particularly since we find a plain error of law, as the result of which the appellant was not given a proper opportunity to present his evidence.

■ Probably the most damaging testimony against the defendant was that of Mrs. Nancy Elizabeth Totten, Krumm's former secretary, who, at the time of the trial, was on ten years' probation following a plea of guilty to a charge of signing and passing checks drawn upon a bank where she had no account.

Mrs. Totten told on the stand an amazing story of an alleged plot by the appellant to murder Krumm, his former partner, so as to prevent the latter from exposing the appellant's alleged connection with the disappearance of the books. The witness' testimony on this point was in part as follows:

" * * * The crime that he finally evolved was that I was to—shall I say lure? —or in any event I was to get Mr. Krumm out on some deserted section of the road that was to be chosen at a later date, probably out towards Randsburg 'or some place in the desert, and was to be in the car with him, and this place was to be chosen beforehand, so that I would know the exact spot. At a given hour I was to get Mr. Krumm by there even if we had to go on week-end trip together, and there was to be a car waiting at this spot or a little bit before it, that would spring out after us. Now, this spot to be chosen was to be some place where there would be a drop off to one side, a cliff of some kind by the side of the road. As we drove past, that is, as Mr. Krumm and I drove past this spot, this car, in which Mr. Cossack, in which these other parties were to be, would pull out and follow us, and as soon as we reached this spot, drive up alongside, and Mr. Krumm was to be—well, shall we say shot? In any event, he was to be killed very deliberately at the time the car pulled alongside of us. My instructions were to be wearing gloves, to reach over and pull the emergency brake of the car so it would not go over to the edge with me in it, and Mr. Krumm—then I was to get out of the car, and Mr. Krumm's valuable[s], and watch and ring, whatever he had in his pockets, would be taken from him, and then the car was to be started, the wheel turned and let go over the edge so that when the car was found, if it ever was, it would appear as if the motive had been robbery out in the desert. Then, this other car was to bring me back into town. In the meantime, I was to have my alibi established as to whose home I had been in and so forth."

Mrs. Totten was called by the government after it had rested its case, the Assistant United States Attorney moving to reopen the government's case in chief on the ground that the witness was one "that we endeavored to get under subpœna at the very time this case was set for trial and did not get service [on] until late yesterday afternoon." After considerable cross-examination, she was permitted to leave the stand, subject to recall for redirect examination. Defense counsel also had requested that she be not released. She was later recalled by the government for so-called "direct examination," according to the transcript. The examination, however, was obviously redirect. There was some further "cross-examination," and Mrs. Totten was again excused, whereupon the government again closed its case in chief. Finally at the request of the appellant, Mrs. Totten was once more recalled to the stand, for cross-examination. During the questioning of this witness the court announced to defense counsel that Mrs. Totten might be examined "with respect to anything else" save concerning her visit to G. R. Edgington, an attorney, who had previously testified in the case. The circumstances of that visit do not concern us here.

Thereupon, the appellant announced that he wanted to lay a foundation for the purpose of "showing the conversation" that Mrs. Totten had with him. The court replied that Mr. Moore, of defense counsel, "was interrogating the witness," and ordered that the next witness be called.

Mr. Moore formally restated his proffer as to the Edgington matter, and the court again shut off the argument and repeated its request that the next witness be called. The appellant then announced that he desired to cross-examine Mrs. Totten for the purpose of laying a foundation. The following colloquy ensued:

"Mr. Cossack. In other words, your Honor, I desire to ask her whether she had a conversation with a person by the name of Steve Revoll [Rehwald].

"The Court. Never mind.

"Mr. Cossack. If the court please, it goes to the meat of the situation.

"The Court. That is enough.

"Mr. Cossack. Might I make my offer?

"The Court. No.

"Mr. Cossack. I take an exception."

It is perfectly apparent from the record that the appellant was attempting to lay the foundation for the impeachment of the witness Totten, but that he was improperly not permitted to do so.

Later, the appellant called Stephen P. Rehwald, property manager of an investment company. Rehwald testified that he had had a conversation with Mrs. Totten in January, 1932, a month prior to the trial, in which conversation the appellant's name was mentioned. No one else was present. When the appellant asked Rehwald what that conversation was, the government objected on the ground that no foundation had been laid. The court sustained the objection, even after the appellant reminded it that he had requested the right to cross-examine Mrs. Totten "while she was on the stand," for the very purpose of laying a foundation.

The appellant's offer to recall Mrs. Totten to the stand for further cross-examination for the same purpose was refused by the court, with the observation that it was "not an impeaching question * * * the witness cannot be impeached in this manner." The appellant asked the court to allow him to call Mrs. Totten to the stand "to bring out the reason for this testimony," and was again refused. Mr. Moore reminded the court that Mrs. Totten had been called after the government's case was closed. The court re-plied: "I do not want any argument. Mrs. Totten has been called and recalled several times. If you had anything in mind you had ample opportunity even this morning to question her about it. The case is going to end some time."

It will be recalled that it was precisely this "opportunity" that the court had previously denied the defense.

The defense then rested. In the absence of the jury, the following proceedings took place:

"Mr. Cossack. May it please the court, at this time with reference to the testimony of Stephen Rehwald, for the purpose of laying the foundation in order to impeach the testimony of Nancy E. Totten, with respect to the statements relative to me—I at this time offer—

"The Court. Your request is not timely. We closed the evidence, as I understand it, at 12 o'clock. Proceed.

"Mr. Cossack. I might state that it is in the nature of newly discovered matter.

"The Court. No, nothing whatever.

"Mr. Moore. If your Honor please, we ask that this be marked as our offer of proof, and I also ask that I be permitted to read it into evidence for the purpose of the offer itself.

"The Court. You may mark it for identification.

"The Clerk. That will be Defendant's Exhibit 'L' for identification."

Rehwald's affidavit follows in part:

" * * * On February 14th, 1932 [the day before the affidavit was offered in court] at about the hour of 11 p. m., he had a long distance telephone conversation from San Bernardino to Los Angeles with Loeb L. Cossack, and in this conversation informed the said Loeb L. Cossack of * * * newspaper accounts relative to the testimony of Nancy B. Totten in this case, and related to the said Loeb L. Cossack at said time and place the following facts which he can testify to in this case.

"That during the first part of January, 1932, he called at the office of Theodore G. Krumm, * * * to collect the sum of $25.00 from said Krumm, and inquired of Nancy B. Totten, if Krumm was there, and when being informed he was not, stated to Totten that he wanted to collect $25.00 from Krumm. Thereupon said Totten replied in substance and effect that business was too poor and Krumm did not have any money. And that when Krumm and Loeb L. Cossack

dissolved their partnership, Loeb L. Cossack retained all of the clients of the firm. And that Loeb L. Cossack was not so smart because they were laying for him. Inquiry was made by affiant as to what Totten meant that they were 'laying for Loeb L. Cossack,' and Totten replied: that they 'were going to get Loeb L. Cossack out of their way permanently.' Affiant then asked how they were going to do this and Totten replied that Loeb L. Cossack had a case coming up in the federal court and that they were going to 'get Loeb L. Cossack' with their testimony. Affiant then asked 'Loeb is in the clear on that, isn't he?' and Totten replied, 'He may be, but we are going to fix it so that he won't be so clear.' "

After this document had been offered, another witness was permitted to testify for the defense, though it had previously rested its case.

It must be remembered that Mrs. Totten herself had been called by the government after it had rested its case-in-chief; that the defense had made repeated and unsuccessful offers to lay the foundation for this impeachment during and after her cross-examination; that she was already under a felony cloud; that her testimony, if believed, would convince the jury that not only was the defendant Cossack guilty but was willing to resort to the most heinous crime known to the law in order to conceal his guilt; and that the impeaching evidence, on its face, disclosed that it was "newly-discovered." In view of all these circumstances, we believe that the court committed an abuse of discretion in refusing the appellant's offer to present this evidence to the jury, tardy though the offer was. Such refusal, we believe, deprived the appellant of a complete opportunity of presenting his case, and therefore fell short of the Anglo-Saxon conception of a fair trial.

We cannot say that the jury would have convicted the appellant had it disbelieved Mrs. Totten's testimony.

With regard to the tardiness of the offer to lay a foundation on cross-examination, it may be said that the importance of cross-examination and the latitude that should be accorded to it was emphasized by the Supreme Court in the recent case of Alford v. United States, 282 U. S. 687, 691–693, 51 S. Ct. 218, 220, 75 L. Ed. 624, a case where as here, "the witness for the prosecution had testified to uncorroborated conversations of the defendant of a damaging character." There

the court, reversing this court [41 F. (2d) 157] said:

"Cross-examination of a witness is a matter of right. * * * Its permissible purposes, among others, are * * * that facts may be brought out tending to discredit the witness by showing that his testimony in chief was untrue or biased. * * *

"Counsel often cannot know in advance what pertinent facts may be elicited on cross-examination. For that reason it is necessarily exploratory; and the rule that the examiner must indicate the purpose of his inquiry does not, in general, apply. * * * It is the essence of a fair trial that reasonable latitude be given the cross-examiner, even though he is unable to state to the court what facts a reasonable cross-examination might develop. Prejudice ensues from a denial of the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them. * * * To say that prejudice can be established only by showing that the cross-examination, if pursued, would necessarily have brought out facts tending to discredit the testimony in chief, is to deny a substantial right and withdraw one of the safeguards essential to a fair trial. * * * In this respect a summary denial of the right of cross-examination is distinguishable from the erroneous admission of harmless testimony."

In the Alford Case, the lower court merely had sustained an objection to the question, "Where do you live?" asked of a prosecution witness on cross-examination. In the instant case, the court prevented the appellant from laying the foundation for impeaching testimony which, if believed, would have tended to discredit one of the government's principal witnesses.

See, also, Minner v. United States (C. C. A. 10) 57 F. (2d) 506, 512.

■ It is elementary, of course, that on cross-examination a witness may be asked whether he did not make certain statements inconsistent with his present testimony. Heard v. United States (C. C. A. 8) 255 F. 829, 832, and United States v. Phelan (D. C.) 252 F. 891, 892.

■ As was said in the Heard Case, supra: "A full cross-examination of a witness upon the subjects of his examination in chief is the absolute right, not the mere privilege, of the party against whom he is called, and a

denial of this right is a prejudicial and fatal error. It is only after the right has been substantially and fairly exercised that the allowance of cross-examination becomes discretionary. [Many cases cited.]"

When the appellant was denied the opportunity of laying the foundation for the damaging and impeaching testimony of Rehwald, we cannot believe that he was being given the right "substantially and fairly" to cross-examine Mrs. Totten.

[5] There are many other assignments of error relied upon by the appellant, relating to the refusal of the court to entertain an application for a continuance, relating to the instructions of the court on the grounds that they were partial, prejudicial, and argumentative, and, finally, relating to the admission of evidence during the trial. In view of the fact, however, that we are reversing the case on the foregoing specific ground, it would seem unnecessary to consider the other assigned errors. As was said by the court in Jacobs v. United States (C. C. A. 1) 161 F. 694, 701, "we feel justified in trusting to the probability, or, at least, to the possibility, that, on a new trial, they may all disappear."

The judgment is reversed and the case is remanded to the District Court, with instructions to grant a new trial in accordance with law.

Reversed and remanded.