BALDWIN et al. v. UNITED STATES.
No. 7146.

Circuit Court of Appeals, Ninth Circuit.
Aug. 31, 1934.

NORCROSS, District Judge, dissenting in part.

———◇———

William W. Ray and J. M. Christensen, both of Salt Lake City, Utah, and S. C. Ford, of Helena, Mont., for appellant Stohl.

Albert R. Barnes, of Salt Lake City, Utah, for appellants Faulkner and Hansen.

William B. Higgins, of Fillmore, Utah, for appellants Baldwin, Dixon, Brown, Haueter, and Penney.

Edward M. Morrissey, of Salt Lake City, Utah, for appellant Madison.

E. A. Rogers, of Salt Lake City, Utah, for appellant Harry Green.

C. A. Spaulding, of Helena, Mont., for appellant Riedman.

Frances C. Elge, of Helena, Mont., for appellant Joseph Green.

Wellington D. Rankin, U. S. Atty., and Arthur P. Acher, Asst. U. S. Atty., both of Helena, Mont.

Before WILBUR and GARRECHT, Circuit Judges, and NORCROSS, District Judge.

WILBUR, Circuit Judge.

The defendants and appellants were charged with having mailed or caused to be delivered by mail certain letters and circulars set forth in counts one to ten, inclusive, of the indictment to execute or attempt to execute a scheme and artifice devised by them for obtaining money and property by means of false and fraudulent pretenses, representations, and promises in the promotion and sale of stock in Nathaniel Baldwin, Incorporated, in violation of section 215 of the Federal Penal Code (18 USCA § 338), and in count 11 of the indictment with having conspired to so use the mails in violation of section 37 of the Federal Penal Code (18 USCA § 88).

The trial court directed a verdict in favor of the defendant Fred R. Woolley. The remaining sixteen defendants were convicted and all appeal. As to the defendant-appellant Charles H. Barnett, who died since his appeal was perfected, the criminal action has abated. The appeal as to him is therefore dismissed. Rossi v. United States (C. C. A.) 21 F.(2d) 747.

There were ten briefs submitted on behalf of the various appellants and many alleged errors are argued in the briefs which were not assigned as error. This court has repeatedly held that errors argued in the briefs but not assigned as error will not be considered. Holsman v. U. S. (C. C. A. 9) 248 F. 193, 198; Wight v. Washoe County Bank (C. C. A.) 251 F. 819; Pattis v. U. S. (C. C. A.) 17 F.(2d) 562.

Assignments of errors Nos. 1, 2, 6, and 8 deal with the trial court's denial of the respective appellants' motions for directed verdicts. Assignment No. 6 alleges as error the statement of the trial judge, made in the presence of the jury at the time these motions were interposed, to the effect that the evidence introduced by the government was sufficient to sustain a conviction in the event the jury should convict the defendants. It will be noted that this was the very question the trial judge was called upon to determine in ruling upon the motions and there was no error in so stating his conclusions. This is particularly true in view of the fact that the trial judge in a federal court has the right to comment upon and to state his opinion as to the evidence being careful to advise the jury that his opinion as to the evidence is not binding on them but that they are the sole and exclusive judges of the facts. Chetkovich v. U. S. (C. C. A.) 53 F.(2d) 26. Moreover, no objections were made and no exceptions were taken to the remarks of the trial court at the time and, consequently, error cannot be predicated thereon.

Assignment No. 1 is based upon the alleged error that the trial court denied the motion of appellants for directed verdicts interposed at the close of the government's case. Appellants, having thereafter introduced evidence in their behalf, have waived their objection and cannot urge the matter on appeal. Deupree v. U. S. (C. C. A. 9) 2 F.(2d) 44; Edwards v. U. S. (C. C. A. 8) 7 F.(2d) 357. However, the question of the sufficiency of the evidence to sustain the verdict and judgment is presented on this appeal under assignments Nos. 2 and 8 which are based upon the motions for directed verdicts interposed on behalf of the various appellants at the close of all the evidence, which motions were denied and appellants' exceptions properly noted in the record.

The evidence shows that appellant Baldwin was the president of the Nathaniel Baldwin, Incorporated, and owned most of its stock of the par value of one dollar per share which he transferred to the Omega Investment Company, a holding company organized by him for that purpose. The Omega Investment Company, acting through appellant Baldwin, gave Daniel Alexander, an officer of the Intermountain Sales Company, an option on 400,000 shares of the Nathaniel Baldwin Incorporated stock and appellant Baldwin was to receive the par value of $1 for every share of stock sold. A very extensive sales campaign was conducted through the offices

of the Intermountain Sales Company and the stock was sold to the public for from $3 to $4.50 per share on the strength of false representations and promises as to the earnings, prosperity, and prospects of the company, as to its financial condition, as to its equipment and capacity for manufacturing radio sets, as to the demands for its products and orders on hand, including an alleged contract for the sale in advance of its entire factory output for the period of five years, and as to the rising price and value of its shares. The letters and circulars containing the false statements were introduced in evidence as exhibits. The evidence is practically uncontradicted that the letters and circulars containing the false statements and representations were mailed and received through the mails as alleged in the indictment and that these were mailed as part of a sales campaign with the purpose of inducing investors to purchase stock in the Nathaniel Baldwin, Incorporated, or to lull those, who had already purchased stock in the Baldwin Company, into a sense of security.

It appears that the stock selling campaign started with the mailing of a circular urging the advisability of investment in the radio industry. The circular included a letter signed by Baldwin to the effect that he had been persuaded by his friends to offer a portion of the Baldwin Company stock to the public and also a letter signed by Lorenzo Stohl, general manager of the Baldwin Company, stating that he had purchased stock for himself and family and expressing confidence in the future of the company. Approximately 157,000 of these circulars were mailed to prospective investors. This was followed up by a letter stating that the company had paid out over a million dollars in profits and on the back of this letter was a false financial statement as of December 31, 1928, showing the company had patents valued at $2,000,000 and a surplus of $1,706,343.29. As a matter of fact the company had not paid out a dollar in dividends and the books of the company on December 31, 1928, showed patents valued at only $336,913.94 and a deficit of $6,110.56 instead of a surplus. Many other letters were sent to the stockholders and prospective purchasers from time to time falsely representing the progress and success of the company.

A newspaper advertising campaign was also used as a means of reaching prospective investors and full page advertisements containing false statements were inserted in numerous newspapers. For instance, one of the advertisements contained the statement that the Baldwin radio was tested by experts in New York and found to be so superior that as a result of this test the man who conducted it sought and obtained for his company a contract to sell the entire factory output for five years—up to 500,000 sets per year. The advertisement was headed in bold type, "SOLD OUT FOR FIVE YEARS," and gave the impression that the entire output of the company had been sold out for five years. In fact, no such test of the Baldwin radio was ever conducted and no such "sold out" contract was ever executed, but a contract was executed which merely gave an exclusive selling agency for the output up to 500,000 sets but the agent did not agree to purchase a single set. Reprints of this advertisement and others used in the campaign were mailed to many thousand people and also were furnished to salesmen to be used by them in their sales kits. Telegrams were also frequently used as a means of conveying false information and aiding the salesmen in closing sales to prospects.

It appears from a letter written by appellant Hansen to appellant Keller of the home office of the Intermountain Sales Company that Hansen was very much aggravated when one of his prospective customers wired to Firmage, a director of the Baldwin Company, in regard to buying the stock and Firmage replied, "Use your own judgment," whereas Hansen expected Firmage to reply in a manner that would encourage the prospective customer to buy the stock. In a subsequent letter to appellant Nathan appellant Hansen stated: "Send me some real stuff, something I can show the prospects—something like this—'Stock going rapidly—will be oversubscribed—price to be advanced any day—close up pending subscribers at once.'" That little regard was had for the truth in these telegrams appears from two of them introduced as exhibits in which it was stated that the orders on hand were in excess of $1,750,000. It is admitted that this statement was wholly untrue.

The books of the Baldwin Company show that during the stock selling campaign the company was continually losing money but in spite of this the price of the stock was arbitrarily raised from time to time to induce people to buy stock and to induce them to believe, as had been so often falsely stated, that the business of the company was very successful and profitable.

The appellants who were salesmen for the Intermountain Sales Company claim that, in making statements concerning the value

of the stock or the prospects of the company, they relied on the information contained in their sales kits and that they acted in good faith and actually believed the statements to be true. The sales kits were made up in part of the letters, telegrams, and circulars containing greatly exaggerated reports of the progress of the company and profits to be realized therefrom by its stockholders and were intended to instill confidence in the investors and induce them to purchase the stock. Many of the investors to whom the salesmen appellants sold stock were called as witnesses and testified to false representations made to them by the salesmen, in addition to those contained in the sales kits and which must have been known by the salesmen to be false or at least which they had no reasonable ground for believing to be true. Letters written by the appellants who acted as salesmen to the offices of the Intermountain Sales Company were introduced in evidence. It can reasonably be inferred from the contents of these letters that the writers knew that the sales campaign was based upon fraudulent representations and that they participated in the scheme. This evidence was sufficient to justify the submission of the case to the jury and to support the verdict of guilty as to the salesman appellants Joseph H. Green, Harry M. Green, George W. Riedman, N. M. Hansen, W. H. Haueter, A. A. Madison, Einar Brown, Floyd Dixon, John E. Martin, and Harvey Penney.

■ No briefs were filed on behalf of the appellants Frank Keller, Jr., and E. H. Nathan, who were officers of the Intermountain Sales Company. The evidence is clearly sufficient to sustain the verdict and judgment as to them. The evidence shows that they took an active part in the conduct of the sales campaign and the preparation of the letters and circulars containing the false statements.

■ The appellants who were officers of the Baldwin Company, Nathaniel Baldwin, Lorenzo Stohl, and Henry H. Faulkner, disclaim any connection with or interest in the sales campaign conducted by the Intermountain Sales Company. However, there is evidence in the record that these appellants had a part in preparing or approving some of the letters and circulars containing false statements and they must have known them to be false and were to be used to procure purchasers for such stock. Perhaps the strongest claim to innocence is that made by appellant Baldwin, but it appears that he did in fact lend his name to the stock-selling enterprise and did sign untrue statements which he knew

were to be used to induce people to invest in the stock of the Baldwin Company which he, acting through his alter ego the Omega Investment Company, was selling to the option holder Intermountain Sales Company for resale to such people. While it is true that appellant Baldwin notified the officers of the Intermountain Sales Company to discontinue the use of his name in conducting their sales campaign, yet no public disclaimer was made. He could not purge himself of wrongdoing by merely notifying his coconspirators to discontinue to use his name in furtherance of the conspiracy. The evidence in the record, when taken as a whole, together with the inferences to be drawn therefrom, is amply sufficient to sustain the verdict of the jury and the judgment entered thereon by the trial court.

■ Assignments of error Nos. 3 and 5 are as follows:

"The District Court erred:

"(3) In ruling made over objection admitting evidence on behalf of the United States;
* * *

"(5) In instructing the jury to which instructions exceptions were taken by Nathaniel Baldwin at the time the same were given."

These assignments do not comply with rule 11 of this court and, as we have repeatedly held, they therefore should not be considered. Cossack v. United States (C. C. A.) 63 F.(2d) 511; Daniels v. United States (C. C. A.) 17 F.(2d) 339; Hall v. United States (C. C. A.) 48 F.(2d) 66. Assignments No. 9, that "the verdict is against the law," and 10, that "it was error to give and render judgment against the defendants on said verdict," are too general and indefinite to present any question to the appellate court for review. Lawson v. United States (C. C. A.) 297 F. 418; O'Brien's Manual on Federal Appellate Procedure, p. 110.

■ On behalf of appellant Baldwin there was an exception taken to the trial court's refusal to give defendant's proposed instructions Nos. 1 and 2. However, those proposed instructions are not included in the bill of exceptions and the point cannot, therefore, be considered. An exception was taken to the statement of the trial court in the course of his instructions to the jury to the effect that perhaps Mr. Insull enjoyed one of the best reputations in the country before he embezzled some $2,000,000,000 in connection with his particular companies, but the giving of this instruction is not properly assigned as error. Moreover, no ground of ob-

jection was stated to the court. Merely identifying the statement by saying "the remarks of the court with reference to Insull as touching the proposition of character and good reputation," without stating the ground of the objection to the instruction, is insufficient to raise the question of error in giving the instruction, if any error was committed. Sacramento Suburban Fruit Lands Co. v. Johnson (C. C. A.) 36 F.(2d) 925; Dayton Rubber Mfg. Co. v. Sabra (C. C. A.) 63 F. (2d) 865; State Life Ins. Co. v. Sullivan (C. C. A.) 58 F.(2d) 741. We quote the instructions covering evidence of good reputation and character in the course of which the statement was made: "Now, reputation is a valuable possession, it is what seems to the public at large. Character is what a man really is and reputation is supposed to reflect his character. But if you believe a good reputation has been proven in this case, that is not to inspire you to acquit him merely because he has a good reputation. All men perhaps before they commit their first crime may enjoy a good reputation. Perhaps Mr. Insull over in Greece had one of the best reputations in the country before he embezzled some two billion dollars in connection with his particular companies. The law says this: A defendant may prove his good reputation if he can, and in so far as the jury believes it is entitled to consideration in determining credibility and the likelihood or unlikelihood of his having committed the things charged against him, it will give it that much weight and no more. If proven satisfactorily to you he is entitled to any weight you accord it in determining whether he committed the offenses charged against him. Now, it is true and logical and a matter of common sense, that if the case is close, yet apart from good repute you had no reasonable doubt of the man's guilt, if he did prove to you a good reputation by trustworthy witnesses, why, it might serve to turn the scale in his favor and create a reasonable doubt of guilt. Therefore, it is for you to determine how much weight you will give the good reputation if proven."

Furthermore, the statement of the trial court about Mr. Insull's having defrauded people of some $2,000,000,000, although of previously good reputation, was, so far as this case is concerned, merely by way of illustration of the fact that proof of good reputation does not directly negative guilt. The only objection to it which can be advanced by appellant was that it tended to affect the weight to be given the testimony of appellant's character witnesses. But this comment is within the province of the trial judge as he has a right to inform the jury that a man may have a good reputation and yet commit crime.

Assignment No. 7 is as follows: That the District Court erred "In sustaining the government's objection to a question propounded to the defendant Baldwin in effect as follows: 'How much were you offered by the Westinghouse Electrical Company for the entire business of the Nathaniel Baldwin Incorporated?' "

It is pointed out by appellee that no such question was propounded to the witness. The record shows that Baldwin was not permitted to testify as to the amount that had been offered to him by the Westinghouse Electrical Company for his patents. This point is therefore based upon an assignment of error which does not cover it and no reviewable question is presented.

There remains for consideration the claim of appellants that they were deprived of a fair trial by the conduct of the trial court. No objections were made to any of the several acts of the trial judge now alleged to be misconduct and no exceptions were taken thereto. The only assignment of error bearing on that matter is assignment No. 4, which asserts error in refusing to permit counsel for defendants sufficient time to inspect the various exhibits offered in evidence by the United States prior to admitting such exhibits in evidence. This assignment is not based upon an objection and exception stated therein and is therefore insufficient. It is urged in the briefs of appellants, as indicating that appellants were deprived of a fair hearing that the trial court frequently admonished counsel for defendant to proceed briskly, that counsel were not afforded the opportunity of examining the exhibits and that the case was tried in a much shorter time than should be required for a case of this kind. It is the duty of the trial judge in the conduct of the trial to expedite matters and prevent the wasting of time. Appellants were represented by experienced and able counsel and they made no objections to the attempts of the court to expedite the trial and cannot be heard now on such objections.

It is urged by the appellants that this court should notice a plain error committed by the trial court even though the same has not been properly assigned. We have examined the record in this case and see no occasion for waiving the rule requiring assign-

ments of error as a basis for the presentation of errors on appeal.

Judgment affirmed.

NORCROSS, District Judge (dissenting).

I concur in the order of affirmance of the judgment in respect to the defendants Keller and Nathan, and dissent therefrom in respect to all other defendants.