## UNITED STATES *v.* HINZ *et al.*

### *(Circuit Court, N. D. California.* May 21, 1888

1. CRIMINAL LAW—ACCOMPLICES—TURNING UNITED STATES EVIDENCE—RIGHT
TO IMMUNITY—FORFEITURE BY BAD FAITH.

   Hinz, accused as an accomplice in crime, upon a promise of immunity if he
would testify truly before the grand and trial juries, and thereby aid in the
indictment and conviction of his co-conspirators, testified fully before the
grand jury, and upon his testimony a joint indictment was found against his
associates in crime and himself. After a trial jury had been impaneled to try
three of the parties, to whom a separate trial had been granted, Hinz informed
the prosecuting attorney of his determination to so change his testimony as
to wholly exonerate the parties on trial, and thereby render it impossible to
convict them upon testimony then available; and, upon being threatened with
a prosecution for perjury, if his testimony should be so changed, he refused
to testify at all, and the prosecuting attorney was then constrained to make,
and did make, an arrangement with another accomplice to testify upon simi-
lar terms, who, having testified, was discharged, and a *nol. pros.* as to him en-
tered. Hinz was thereupon arrested, and held to answer to the indictment.
After the other testimony of the prosecution and of the defense was all in,
Hinz offered, and was anxious, to testify in rebuttal, but nis offer was declined.
*Held,* that Hinz, by refusing to testify before the trial jury, as he had agreed
to do, notwithstanding his testifying before the grand jury, had forfeited all
right to immunity or clemency, and subjected himself to trial and conviction;
and the court refused to continue the case in order to allow him an opportu-
nity to apply to the president for a pardon before conviction.

2. SAME—DISCRETION OF COURT.

   Whether an accomplice already indicted shall, upon promise of immunity,
be admitted as a witness for the government or not, is determined by the
judges in their discretion, as may best serve the purposes of justice.

3. SAME.

   If the accomplice offering himself as a witness with the expectation of im-
munity appears to have been the principal offender, he should be rejected.

4. SAME—CONFESSIONS.

   If an accomplice, having made a private confession, upon a promise of par-
don by the attorney general, should afterwards refuse to testify, or in bad faith
testify falsely, he may be convicted upon the evidence of that confession.

5. SAME—ACCOMPLICE TESTIMONY—CORROBORATION.

   The court will advise a jury not to convict of felony upon the testimony of
an accomplice alone, without corroboration.[1]

6. SAME.

   If two or more accomplices are produced as witnesses, they are not deemed
to corroborate each other; but the same rule applies, and the same corrobo-
ration is required, as if there were but one.[1]

7. SAME—PARDON—CONTINUANCE.

   Although the prosecuting attorney has no authority to contract that a per-
son convicted of crime shall not be prosecuted, if, when examined as a wit-
ness against his accomplices, he declares, fully and fairly, his and their guilt,
yet when he does so under promise of immunity, and his evidence is accepted
by the court, he is equitably entitled to immunity, and a recommendation for

---

[1] Concerning the necessity of corroborating the testimony of an accomplice, in order
to sustain a conviction, and the extent of such corroboration, see People v. Elliott, (N.
Y.) 12 N. E. Rep. 602, and note: People v. Kunz, (Cal.) 14 Pac. Rep. 836; Patterson v.
Com., (Ky.) 5 S. W. Rep. 387; People v. Clough, (Cal.) 15 Pac. Rep. 5; State v. Dana,
(Vt.) 10 Atl. Rep. 727; Dodson v. State, (Tex.) 6 S. W. Rep. 548; Boyd v. State, Id. 853;
Wisdom v. People, (Colo.) 17 Pac. Rep. 519; Pool v. State, (Tex.) 8 S. W. Rep. 817;
Buchannan v. State, Id. 665. As to who is an accomplice within the rule, see Smith v.
State, (Tex.) 5 S. W. Rep. 219, and note.

pardon; and should the prosecuting attorney not enter a *nolle prosequi*, but insist upon a trial, the court will continue the case in order to allow time for the accused to apply to the president for a pardon.

*(Syllabus by the Court.)*

On Motion to Continue Case.

Indictment for conspiracy to land Chinese on forged certificates.

*H. C. Dibble*, for motion.

*J. T. Carey*, U. S. Atty., *contra*.

Before SAWYER, Circuit Judge, and HOFFMAN and SABIN, District Judges.

SAWYER, J.    In October, 1885, the district judge called the attention of the grand jury then impaneled to the supposed conspiracy charged in this indictment, and directed that body to investigate the matter.    After a full investigation upon the evidence then at the command of the government, the grand jury were unable to find an indictment, and the bill was ignored.    Afterwards, a fortuitous concurrence of circumstances brought the defendant, Hinz, into communication with Mr. Scott, a deputy-collector, who introduced him to Mr. McPike, the assistant United States attorney.    In the conference had, the assistant United States attorney promised Hinz that, if he would disclose all the facts in regard to the conspiracy, and testify to the whole truth fairly before the grand and petit juries, he should not be prosecuted.    This proposition having been accepted by Hinz, he was taken before the grand jury at that time in session, by the United States attorney, where he testified fully in regard to the matter, the result of which was the finding of the present bill, charging William A. Boyd, F. D. Ciprico, E. W. McLean, W. W. Whaley, and the party now before the court, A. Hinz, himself, with the conspiracy in question.    Hinz, and deputy-collector Scott, were the only witnesses examined before the grand jury.    It was very clear from the evidence developed on the trial of Ciprico, McLean, and Whaley that Scott could not have testified as to many of the principal and essential facts, and that the indictment could not have been properly found upon any evidence then in possession of the government without the testimony of Hinz.    All the parties charged, except Hinz, were arrested, and all arrested were discharged on bail except Boyd, who, being unable to procure bail, was committed to prison, where he remained until the trial of Ciprico and McLean.    All the parties arrested having pleaded not guilty, on motion of Ciprico, McLean, and Whaley, with the consent of the United States assistant attorney, who tried the case, a separate trial was granted to them, leaving Boyd to be tried alone.    The United States attorney determined to try Ciprico, Whaley, and McLean first, doubtless believing that he could make a stronger case against them than against Boyd, for Mrs. Boyd was a vitally important witness against those defendants, and she would be an incompetent witness against her husband; and in this case, had Boyd been on trial at the same time, her testimony would have been inadmissible.    A conviction of Ciprico, also, might

v.35F.no.4—18

open the way to the more certain conviction of Boyd. The fact that Mrs. Boyd would be an incompetent witness in case of a joint trial, may also account for the readiness of the attorney of the United States to consent to a separate trial. However this may have been, a separate trial was granted, and it was determined to try Ciprico, Whaley, and McLean first, and the trial was set for Tuesday, March 27th. On the morning of that day, a jury was impaneled by Asst. Atty. Weller, Mr. McPike, who was to try the case, being engaged in the trial of another case in the district court; and, after the jury was impaneled, the trial was adjourned over till Thursday, March 29th. What then occurred to affect the action of the prosecuting attorney we will state in his own language, taken from his letter to the attorney general, read on behalf of Hinz on this motion, suggesting a pardon, which we have no doubt is literally and strictly true, as it corresponds exactly with the account given to the court at the time, for the purpose of explaining his sudden change in the course of the proceedings. He says:

"On the day that the jury was impaneled, I met Mr. Hinz; told him that I had no time to go over his testimony again with him; and asked that he furnish me with a written statement of what he proposed to testify to before the trial jury, which he did. Upon examination, I found that the government could not depend upon Mr. Hinz as a witness against Ciprico and McLean, they having procured separate trials from defendant Boyd. This written statement of Mr. Hinz being so much at variance with his testimony before the grand jury, my suspicions were immediately aroused, and I saw at once, that if I were to depend upon him, Ciprico and McLean would be acquitted beyond all question; that defendant Boyd, from this circumstance, would gather hope, and in all probability, the case against him would also fail, and the government suffer the humiliation of not being able to prove the existence of the conspiracy, or punish the guilty parties. I firmly believed at the time that Mr. Hinz had been induced by corrupt means to change his testimony, and thereby defeat the government, for his was the only testimony upon which I could depend to give a history of the conspiracy—the rest of the evidence being only in corroboration. Accordingly, on the evening before the trial began, I visited the jail where defendant Boyd was, and induced him to turn state's evidence, promising him exemption from punishment, if he would do so. He came into the court-room the next morning, and was the first witness on the stand. I then introduced what corroborative testimony I had at hand, and rested the case."

Mr. Pike, further on in his statement, says:

"It must be admitted that his conduct in offering to change his testimony can receive no extenuation," and "it is true that by his acts he compelled me to have recourse to Boyd, but this fact did not add to his guilt as a conspirator."

And in connection with these remarks he submits some considerations for the exercise of clemency, notwithstanding these facts.

In his affidavit in opposition to the present motion, after stating the testimony given by Hinz before the grand jury, and the testimony which he proposed to give at the trial, Mr. McPike, among other things, says:

"Affiant had three conversations with said Hinz relative to what his testimony would be upon the trial of said cause,—one in affiant's private office in the presence of H. H. Scott; one in affiant's room, in the office of the

United States attorney's office; and one in the court-room. The last two named were after the jury had been impaneled for the trial of said cause. In each of these interviews affiant used all honorable efforts possible to induce said Hinz to state the facts as he had detailed them before the grand jury, but which said Hinz declined to do, and steadfastly persisted in changing his testimony so as to defeat the prosecution. Affiant being put to straits, then summoned the grand jurors, or some of them, for the purpose of being prepared to establish the statements made by said Hinz, before that body, and informed said Hinz that, if he insisted upon testifying as threatened by him, he would have him arrested for perjury. Hinz, after being informed by affiant of his purpose to arrest him for perjury if he should falsify his statement made before the grand jury, refused to testify in the cause at all. In each and all of said conversations said Hinz refused to testify as he had theretofore done before said grand jury, but insisted that he would testify as stated in said written memorandum, which said statement wholly exonerated the defendant Ciprico from all participation in said conspiracy and charges contained in said indictment. Under these circumstances it was that affiant offered inducements to the defendant W. A. Boyd and procured him to turn state's evidence. After said Boyd had taken the witness stand, and had testified, and the prosecution had closed the case for the government, said Hinz came to affiant, and offered to testify as he had before the grand jury, and disclosed to affiant that he, Hinz, had had interviews with defendant Ciprico, and that, by certain statements made to him, he had been induced to change his testimony."

Confirmatory of the foregoing statement of Mr. McPike, Deputy-Collector Scott, in his affidavit read on behalf of Hinz, says:

"A short time before the case came on for trial against Ciprico and McLean, Mr. Hinz came to see affiant, at the custom-house, and told affiant that it was possible that he had made a mistake in his testimony before the grand jury, as to his having seen McLean at Mr. Boyd's house. There was some conversation on this matter between affiant and Mr. Hinz, and he then left. Affiant did not see Mr. Hinz again till the night before the case was to come on for trial. There was then some conversation between affiant, Hinz, and McPike, from which affiant concluded that Hinz would not testify as he had done before the grand jury. McPike and affiant then thought it would not be safe to put Mr. Hinz on the stand as a government witness. Affiant further says that next morning in court he met Mr. Hinz with McPike, and from the conversation then had, affiant understood that Mr. Hinz would not testify on the trial as he had testified before the grand jury."

And in his affidavit read in opposition to the motion, Scott further states, as follows:

"Affiant further deposes and says that just before the trial of Ciprico was coming on to be heard, affiant was present at an interview had between said Hinz and said McPike; that in said interview said Hinz stated the changes he proposed to make in his testimony, and it was wholly at variance with what he had theretofore stated the facts to be, and with what he testified to before the United States grand jury, which had found the indictment in said case; that the changes made in his testimony were, in substance, that he did not see McLean at Boyd's house on the evening of the 8th or 9th of January, 1885; that Ciprico was present the evening of the 8th or 9th of January, 1885, at Boyd's house, but, that, he called there on business relative to an incoming or outgoing ship or vessel; that it was the third party present that evening who mentioned the Chinese certificates, but Ciprico did not; that it was this third party who the next morning went on board the City of Peking, as said Hinz was about to depart for China, and made the remark, ' The damned ras-

cal has only given you one hundred instead of five hundred certificates.' His changed testimony, in substance, was such that Ciprico was in no way connected with the conspiracy charged, nor with the delivery, or knowledge of the delivery, of the certificates to Hinz. Affiant further deposes, and says that, at no time prior to the trial of Ciprico, did said Hinz inform this affiant, that Ciprico had desired him to modify or change his testimony, nor of any efforts, that had been made to have him change his testimony, nor of any interviews or meetings he had had with Ciprico and others for the purpose, but, on the contrary, affiant says that Hinz, when accused of having meetings with Ciprico, denied that he had seen him, except upon one occasion he had met him on the street; that affiant did not know that Hinz was considering the matter of changing his testimony, as far as Ciprico was concerned, until the day the jury was impaneled in the trial of the cause of the United States against Ciprico."

On the trial of Ciprico and McLean, on the cross-examination, in answer to numerous questions by the prosecuting attorney upon matters not called out in the examination in chief, and, consequently, it was the testimony of the prosecution, Ciprico fully corroborates the idea that, in several interviews, Hinz had admitted that he had done Ciprico injustice before the grand jury, and indicated a determination to correct his errors at the trial. This testimony was given on the trial, before the statements of Mr. McPike and Scott, before quoted, were made, and when Ciprico, who was himself taken by surprise at the turn of affairs, could not have known the nature of the information upon which the prosecuting attorney changed his course of proceedings from that anticipated. So, also, Hinz's own statement embodied in Mr. McPike's communication to the attorney general, made after Boyd's testimony and his own arrest, when he was extremely anxious to present himself in a most favorable aspect—after he had changed his prior written statement—corroborates the views taken of his action by McPike and Scott; as it shows he had several interviews with Ciprico and his attorneys, and discussed this whole subject, and agreed at least to change his testimony as to McLean, and was manifestly understood by Ciprico to agree to change it as to Ciprico, also.

Upon a full consideration of the case as presented, we cannot doubt that Mr. McPike and Scott had ample grounds to take the view they did, when they dropped Hinz and sought to arrange with Boyd. We are satisfied, now, that they were not then mistaken, and that Hinz had determined to change his testimony in such manner as to exonerate Ciprico, as well as McLean, and that their action was based upon a well-grounded belief that Hinz would prove false and faithless. That Hinz connected Ciprico with the conspiracy in his testimony before the grand jury, necessarily appears, or the indictment could not have been found. At the close of Boyd's testimony implicating Hinz, Mr. McPike, believing that Hinz intended to break faith with him, and had, by his conduct, forfeited all just claims to further immunity from punishment, asked that Hinz be taken into custody under the indictment, and held to bail to appear for trial; and the court, believing it proper, under the circumstances, made the order, which was executed, and he was held to bail in the sum of $5,000. Boyd having fully testified, as he had agreed to do, the prosecuting attorney, in accordance with his promise, immediately entered a

*nolle* as to him, and he was discharged from custody. The court having, on the resting of the prosecution, adjourned over for several days to the next week, it is evident that Hinz began, in the mean time, to realize the critical position in which he found himself. He was now liable to be convicted himself on the testimony of Boyd, with other corroborating testimony, and perhaps his own testimony before the grand jury, in case he should not be accepted as a witness, or if he should be accepted, and testified differently from his testimony before the grand jury, he was liable to be indicted and convicted for perjury. Manifestly, realizing the situation, he at once set about retracing his steps. He sought to appease and reassure the prosecuting attorney, and became anxious to carry out his original arrangement, and go upon the stand. When his proposition was rejected, just before the close of the rebutting testimony, he became so urgent as to waive all right to immunity, and testify without conditions. But even this would have given him an equity, and the district attorney himself interfered, and objected to his going upon the stand, under the circumstances, at this stage of the case, when his testimony, under the rules of law, could add no force to that of his co-conspirator, Boyd. The court concurred with the district attorney, and he was not examined. With a view to applying the law to the case, the following additional facts should be stated: The testimony of Boyd, on the trial of Ciprico and McLean, if it is to be believed,—and there is nothing to the contrary,—shows that Boyd and Hinz are the original and principal conspirators—the originators of the whole scheme, and the principal actors in carrying it out. Boyd was in the collector's office, having the facilities for obtaining and he did obtain the fraudulent certificates in all respects genuine in form, execution, and appearance. He furnished them to Hinz, who carried them in person to China, or received them through the mails or other channels, and sold them, or caused them to be sold. Boyd testifies that Hinz had been to China, and engaged in this business, at least once before the voyage on the 10th of January, 1885, now in question; that they two, without the aid of Ciprico and McLean, had successfully carried on this nefarious business from ten months to a year or so before Ciprico and McLean were let into the arrangement, or had anything to do with it, and that Hinz was the first to suggest the scheme to Boyd; that Ciprico connected himself with the conspiracy not more than two or three weeks before the alleged meeting at Boyd's house on the evening of the 9th day of January, 1885, and was first introduced by him (Boyd) to Hinz at the saloon on Post street about a week before the meeting at his house. Thus, if his testimony be true, Boyd and Hinz are the originators of the conspiracy, and the principals in it,—the conspirators who performed the leading and principal parts,—while Ciprico and McLean, if they participated at all, came in late, and performed the subordinate, though highly important and criminal, part of knowingly landing Chinese upon certificates in all respects duly executed and sealed, and in all particulars, apparently, genuine, furnished and sold to the Chinese by Boyd and Hinz. While this fact does not mitigate the offense committed by Ciprico and McLean, if they conspired with the

others in the way alleged, and should not prevent a conviction, if sufficient legal and proper evidence can be produced of their guilt, it does have some bearing upon the rules of law applicable to the evidence of accomplices, and to the motion for continuance now before the court. At the opening of the trial, a *nolle* was entered as to Whaley, the prosecuting attorney having no evidence to present against him, and none afterwards connected him with the matter. But very slight corroborative evidence was presented against McLean, he and Ciprico having testified on their own behalf, and positively denied all connection with the conspiracy, and the jury could not properly do otherwise than acquit him, as they did. Boyd was discharged upon testifying, as a last resort, at the earnest solicitation of Mr. McPike, when he had abandoned all hope of getting honest evidence from Hinz.

And it only remains now to again try Ciprico, who, if guilty, played a subordinate though highly important part, and to determine whether Hinz, the only remaining principal conspirator, shall go free after having, by his vacillating course, secured the discharge of the other originator of and leading principal in the conspiracy The latter question must depend upon the law applicable to the foregoing state of facts. Says Mr. Greenleaf, in his work on Evidence, which has been a recognized standard authority on that subject in the courts for more than half a century:

"It is a settled rule of evidence, that a *particeps criminis*, notwithstanding the turpitude of his conduct, is not on that account an incompetent witness, so long as he remains not convicted, and sentenced for an infamous crime. The admission of accomplices as witnesses for the government is justified by the necessity of the case, it being impossible to bring the principal offenders to justice without them."

After stating the usual proceedings in such cases, he proceeds:

"But whether an accomplice already charged with a crime by indictment, shall be a witness for the government, or not, is determined by the judges in their discretion as may best serve the purposes of justice. If he appears to have been the principal offender, he will be rejected. And if an accomplice, having made a private confession upon a promise of pardon made by the attorney general should refuse afterwards to testify, he may be convicted upon evidence of that confession." 1 Greenl. Ev. § 379.

So, also, "judges in their discretion will advise a jury not to convict for felony upon the testimony of an accomplice alone, and without corroboration; and it is now so generally the practice to give them such advice, that its omission would be regarded as an omission of duty on the part of the judges. And considering the respect always paid by the jury to this advice from the bench, it may be regarded as the settled course of practice not to convict a prisoner in any case of felony, upon the sole uncorroborated testimony of an accomplice." Id. § 380. Under the Penal Code of California there is no advisory discretion in the judge, but a conviction on the uncorroborated testimony of an accomplice is absolutely prohibited. Pen. Code, § 1111. So, also, "if two or more accomplices are produced as witnesses, they are deemed not to corroborate each other; but the same rule is applied, and the same con-

firmation required, as if there were but one." 1 Green̄l. Ev. § 381. So says the United States supreme court in the *Whiskey Cases:*

"Offenders of this kind are not admitted to testify as of course, and sufficient authority exists for saying that, in the practice of the English courts, it is usual that a motion to the court is made for the purpose, and that the court, in view of all the circumstances, will admit or disallow the evidence as will best promote the ends of public justice. Phil. Ev. 87; 3 Russ. Crimes, (9th Amer. Ed.) 598." 99 U. S. 603.

In the *Whiskey Cases* it was also held that "the district attorney has no authority to contract that a person accused of an offense against the United States shall not be prosecuted, if, when examined as a witness against his accomplices, he discloses fully and fairly his and their guilt." Id. 594. In the same cases, after stating that the prosecuting officer will grant an interview to an accomplice, and the communication will be regarded as confidential, and that if he is subsequently called and examined, he will be entitled to a recommendation for executive clemency, the court adds: "Promise of pardon is never given in such interviews, nor any inducement held out beyond what the before-mentioned usage and practice of the courts allow." Id. 604. The court further says: "Such offenders, if they make a full disclosure of all matters within their knowledge, in favor of the prosecution, will not be subject to punishment; but if they refuse to testify, or testify falsely, they are to be tried, and may be convicted, upon their own confession." Id. 605. Thus it will be seen, that the authority to promise immunity to an accomplice upon his turning state's evidence, is not vested in the prosecuting officer, but whether they will be admitted to testify, and thus secure an equitable right to clemency, is vested in the discretion of the courts, to be exercised cautiously, in view of all the circumstances of the case, and to promote the ends of justice. If the testimony is offered, and the party testifies fully, and frankly, without objection by the court, it will, of course be regarded as given with the sanction of the court, and he is equitably entitled to be exonerated from punishment. But in this case, although the defendant Hinz testified before the grand jury, yet before coming to the trial of Ciprico and McLean, he gave Deputy-Collector Scott, and the prosecuting attorney distinctly to understand, that his testimony would not be such as to implicate either Ciprico or McLean. And afterwards, when threatened with prosecution for perjury, in case he should testify falsely, he, flatly, refused to testify, at all, in the case. He might well, perhaps, have been doubtful about McLean, as it seems probable now, that he did not know him at the time; but as it seems to us, there, certainly, could have been no possible ground for doubt as to Ciprico. That Hinz did not, honestly, change his mind as to the testimony he was about to give as to Ciprico, as is now claimed on his behalf, is apparent from the fact, that, at last, he offered, when too late, to again testify as he had done before the grand jury, and connect Ciprico with the conspiracy; that Scott and McPike firmly believed, and had ample grounds to believe, that Hinz would not testify against Ciprico, and that, without his testimony, there was no possibility of a conviction of either

of the defendants on trial, there can be no possible ground for doubt. Only this extraordinary state of facts could possibly justify, or excuse the prosecuting attorney in the sudden, and extraordinary change of the course of the prosecution. Boyd, together with Hinz, turns out in the evidence adduced on the trial to be not an accomplice, merely, but the principal and the original prime conspirator. In all particulars he and Hinz were the actual chief conspirators, while Ciprico, if connected with them, at all, is but a subsequent accomplice. The rule of law as I have announced it, if rigidly construed, would perhaps exclude the principals Boyd and Hinz entirely, from testifying. Says the rule, "If he [the witness offered] appears to be the principal offender, he will be rejected." 1 Greenl. Ev. § 37⁹. *U. S.* v *Lee,* 4 McLean, 104; *People* v. *Whipple,* 9 Cow. 707.

The prosecuting attorney after his arrangement, made at the last moment, with Boyd, offered him as a witness, and asked the court to permit him to testify in pursuance of the arrangement, and the court appreciating the dilemma in which he so, unexpectedly, found himself, and not knowing the relation of Boyd as principal offender, as was, subsequently, developed, reluctantly, consented; and Boyd, having testified fully, was discharged. Had his exact relation to the conspiracy, as subsequently developed in the testimony, been known to the court, at the time, it would have hesitated long before permitting him to obtain immunity by testifying against his subordinate, though criminal, accomplices. If Hinz had not indicated a purpose to change his testimony in such manner as to exonerate Ciprico and McLean, but had gone on the stand and testified fully and frankly, with the acquiescence of the court, he would have been entitled to immunity; and if the United States attorney had, then, declined to enter a *nolle,* the court would have continued the case, in order to allow an opportunity to apply to the president for a pardon in advance of the trial; and would have even recommended a pardon. *U. S.* v. *Lee,* 4 McLean, 103. This principle is also recognized in the *Whiskey Cases* already cited. But the difficulty is, he did not do it, but, on the contrary, indicated his purpose to retract his testimony, and he thereby compelled the prosecuting attorney at the last moment, to fall back upon the other chief conspirator, or fail in the prosecution. By so doing, notwithstanding the fact that the indictment was found upon his testimony, he did not stand up to his agreement, and by his course he compelled the prosecuting attorney to seek other evidence, and grant immunity to another principal conspirator. By this action, in our judgment, he forfeited all right, equitable or otherwise, to immunity, or to leniency. And so are the authorities. *Whiskey Cases,* 99 U. S. 605; *Com.* v. *Knapp,* 10 Pick. 477; 1 Greenl. Ev. § 379. His action in the matter was, in our opinion, fully equivalent to an absolute refusal to go upon the stand and testify at all, or, having taken the stand, testified falsely in bad faith in favor of, instead of against, the defendants on trial. And he did in fact, finally, refuse to testify at all, till too late. To exonerate Hinz now, would be, through his action to secure not only his own immunity, but also that of Boyd, the other original and principal conspirator,—all the

principals,—and to turn their united efforts upon Ciprico. This would savor too much of a conspiracy encouraged by the government, of the two original and principal offenders—the concocters and most active executors of the nefarious schemes—to convict an accomplice, who if *particeps criminis*, came later into the conspiracy, and played a secondary and subordinate, however important, and criminal part, in carrying it out. Should Hinz go free there only remains Ciprico to be tried again, McLean having been acquitted, and the jury having disagreed as to Ciprico. It is true that Hinz at last, offered in rebuttal to testify fully and as he did before the grand jury, and to thus ultimately carry out his agreement; and so desirous of doing so was he that upon his rejection by the United States attorney, Carey, that he offered to go upon the stand without conditions. But this was too late. The mischief had been accomplished. The arrangement had been made with Boyd, who had performed his part, and had been exonerated; and Hinz in the mean time had been arrested, and held to answer the indictment. It was not till he found himself in this predicament, when he was likely to be tried and convicted on the testimony of Boyd and other corroborating evidence pointing to him, that did not point towards Ciprico, and perhaps on his own previous testimony, that he became so anxious. At this time the prosecution had no possible use for him. His testimony at that stage of the case, after Boyd had testified, would have had no legal effect. It could not under the law of evidence have strengthened the case. As we have seen: "If two or more accomplices are produced as witnesses, they are not deemed to corroborate each other, but the same rule is applied, and the same confirmation required as if there were but one." 1 Greenl. Ev. § 379. Under this rule Hinz's testimony would have been of no possible use. It was too late, and nothing could have been done affording an equitable consideration for immunity. So, there will be no use for him on the trial, if Ciprico should be tried again, as Boyd is still under obligation to testify in that case, in order to maintain the immunity that has been accorded to him. We see no good grounds for favor or reason for continuing the case in order that Hinz may apply to the president for a pardon in advance of conviction. To grant the motion for the purpose desired, would, doubtless, be regarded as a tacit or implied recommendation by the court that the pardon be granted; a position in which we cannot conscientiously place ourselves. Besides, the prosecution now has the evidence at command, and should a pardon not be granted, there is no knowing whether or not it can be had at the next term of court, two months or more hence. Should a plea of guilty be entered, or a conviction had, the same grounds for pardon will exist, then, as now. It will not prevent the president from extending the executive clemency, if, in his judgment, there are good grounds for such action. The conviction will in no way affect the question. The discretion and responsibility in that matter rest upon the executive, and not upon the courts.

We are clearly of the opinion that the application for a continuance should be denied, and it is so ordered.