ARNOLD v. UNITED STATES.
No. 1540.

Circuit Court of Appeals, Tenth Circuit.
Jan. 13, 1938.

**500**

Kenneth W. Robinson, of Denver, Colo. (Philip S. Van Cise, J. E. Robinson, and Robert D. Charlton, all of Denver, Colo., on the brief), for appellant.

Ivor O. Wingren, Asst. U. S. Atty., of Denver, Colo. (Thomas J. Morrissey, U. S. Atty., of Denver, Colo., on the brief), for the United States.

Before LEWIS, BRATTON, and WILLIAMS, Circuit Judges.

WILLIAMS, Circuit Judge.

John Edwards, John M. McBride, William West, Ralph A. Clifton, Harold P. Kennedy, alias "Hap" Kennedy, alias C. J. Griffin, A. C. James, alias Art C. James, alias Art James, and Oliver Arnold were jointly indicted on September 29, 1936, charged with conspiracy to violate section 317, title 18 United States Code, 18 U.S. C.A. § 317, section 194 of the Criminal Code, as amended, and acts amendatory thereto, during the period beginning with the 10th day of January, 1935, and thence continuously from said date to and including the 23d day of May, 1936, to unlawfully buy, receive, conceal, aid in buying, receiving, and concealing, and to have in their possession three Liberty bonds which had been abstracted from the United States mail.

Said Edwards, Kennedy, and Clifton having entered pleas of guilty later became witnesses for the government. Arn-old (appellant), McBride, West, and James, having entered pleas of not guilty on trial a verdict of guilty was returned. Appellant alone appealed from the adverse judgment.

The indictment being challenged in the court below by demurrer and motion to quash, same were overruled and exceptions saved. It was there urged and renewed here that it was inconsistent in its allegations, impossible in its averments, and so ambiguous respecting the time element in its charge that it cannot support a conviction.

■ An indictment is sufficient to withstand a demurrer or motion to quash if it sets forth the offense with such sufficient certainty and particularity as to advise the accused of the specific charge lodged against him, and to enable him to prepare his defense, and to plead the judgment in bar to a subsequent prosecution for the same offense. Hagner v. United States, 285 U.S. 427, 52 S.Ct. 417, 76 L.Ed. 861; Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314; Foster v. United States, 10 Cir., 76 F.2d 183; Weber v. United States, 10 Cir., 80 F.2d 687; Laska v. United States, 10 Cir., 82 F.2d 672, and Hyde et al. v. United States, 225 U.S. 347, 32 S.Ct. 793, 797, 56 L.Ed. 1114, Ann.Cas.1914A, 614.

This indictment, though awkwardly drawn, appears to meet these requirements. When the different paragraphs contained in the indictment, including the seven overt acts, are construed together, one continuous conspiracy is attempted to be pleaded. No bill of particulars was sought by the appellant.

John Edwards, a defendant and confessed accomplice, testified that having stolen the bonds from the United States mails at Jefferson, Iowa, and bringing them to Denver, he had a conversation with West and Clifton in regard to the disposition of same, when Clifton said that he had responsible connections through whom they could do business, pointing out Kennedy, and knew a banker who would handle same, and Edwards and Kennedy having discussed the matter with him, Edwards later delivered the bonds to Kennedy who took them to the Denver National Bank, returning with a receipt therefor, and that on the following day Kennedy, going to the bank, returned with the money which they divided.

Clifton testified that having discussed the matter with John Edwards, and stating to him that he had a connection through whom the bonds could be sold, introduced Kennedy to Edwards as the person who could negotiate for the disposition of the stolen bonds, and that he was present when Edwards delivered the bonds to Kennedy, who took them to the Denver National Bank, returning with a receipt for them, and that on the following day Kennedy, going to the bank, returned with the money which they divided.

Kennedy testified that Clifton asked him if he knew where disposition could be made of about $50,000 in Liberty bonds, stating that the bonds were coming through West, and that he (Kennedy) knew James of whom he made inquiry about the sale of such bonds, who said they could be sold at the Denver National Bank, to be taken there to Arnold, and that a few days later, on March 21st or 22d, James took him to Arnold's apartment, where after arrival James told Arnold that Kennedy was the man who would bring the bonds to the bank, and Arnold inquired how many there would be and Kennedy replied in excess of $50,000, and Arnold asked what kind of bonds they were and Kennedy replied Liberty bonds that had been stolen in the middle west, and he had seen the letters of transmittal with which they were sent, and Arnold said he did not want to have anything to do with them if there were just a few, that they would take $10,000 in bonds at a time and further asked when they would be there with them, directing him to call in advance, and asked him how much they wanted for the bonds and Kennedy replied 60 cents, and Arnold asked if that could not be reduced some and Kennedy replied he did not know, and it was agreed that Kennedy would come into the bank with the bonds, and Arnold would introduce him to another man, the other man to take care of the transaction, and James said he did not want to get into trouble, Arnold replying there would not be any trouble, and if there was to head it off.

Arnold testified: "I received a telephone call one morning, supposedly from a Chevrolet dealer. I got the impression it was from the *Capitol* Chevrolet dealer, they had a party there that wanted to buy an automobile moving to Denver from St. Louis. Evidently I told him to send him right down. Pretty soon a party came in the bank and said, 'I am here in response to a telephone call in regard to selling some bonds.' I in turn introduced him to Mr. Perkins, our assistant cashier, and he handled the transaction. I don't know anything else about it. I don't recognize Kennedy as the man in question. Don't know whether he is or not. On account of the way my desk was located in the bank I couldn't say how many transactions I would have a day. Some days many more than others, where people would come up to my desk and tell me they wanted to buy bonds or stocks, or securities, and if I was not busy I would spend a minute with them possibly, if Mr. Edwards or Mr. Perkins happened to be busy, until they were at leisure, and then turn them over to Mr. Perkins, or Mr. Edwards, or Mr. Alff, who sometimes handled those transactions. I didn't see Griffin after the incident I have related. If it was Kennedy, I saw Kennedy."

All the evidence in the record connecting Arnold as a party to the conspiracy came from accomplices.

■ Though the testimony of an accomplice should be subjected to close scrutiny and minute examination, and weighed with great caution, still a conviction may be had upon it without corroboration. Caminetti v. United States, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442, L.R.A.1917F, 502, Ann. Cas.1917B, 1168; Tingley v. United States, 10 Cir., 34 F.2d 1; Reger v. United States, 10 Cir., 46 F.2d 38; Hollis v. United States, 9 Cir., 246 F. 832; Graboyes v. United States, 3 Cir., 250 F. 793; Scott v. United States, 7 Cir., 283 F. 117; Henderson v. United States, 8 Cir., 20 F.2d 90, and Nibbelink v. United States, 7 Cir., 73 F.2d 677.

■ Such evidence on the part of the government is sharply contradicted by other direct testimony and circumstances on which appellant relied, conflicting evidence, as a rule, not to be weighed on appeal. Brayton v. United States, 10 Cir., 74 F.2d 389, and Laska v. United States, supra.

Perkins, an assistant cashier of the bank, testified for the government that he took care of the sale of such bonds when William Edwards, its assistant cashier, was at lunch, on vacation, or not immediately available, and that "there is scarcely a day goes by, as a matter of fact, that somebody doesn't come in to transact some business at Edwards' desk while he is at lunch. In that case Mr. Arnold or Mr. Weckbaugh or any of the other officers call on me to wait

on them" in the sale of bonds or anything else.

A year or more elapsed. No further stolen bonds passed through said bank, or through Arnold. "Griffin" presented no further securities. Only these three bonds are involved. Appellant continued his duties as assistant vice president of the bank, no one accusing him of conspiracy to receive such bonds or with knowledge that they were stolen, until May 12, 1936, when the first accusation was made against Arnold, charging him with knowledge that said three bonds had been stolen, and with conspiracy to receive them with such knowledge.

Four witnesses, in addition to the defendant, referred to by the trial judge as "these respectable women and men," testified that Arnold was with them at two successive birthday dinners, March 21 and March 22, 1935, the first when the appellant was in the company of these witnesses from 5:30 p. m. "until about eleven"; the second when appellant remained from 6 o'clock until eight, leaving then and going with his then fiancée, Mrs. Lewis, now his wife, Mrs. Arnold, to St. Luke's Hospital to visit Mrs. Lewis' sister who was ill there, where his presence was accounted for until later in the night. Also the whereabouts of Arnold on the evenings of March 20th and of March 23d, until after 8 o'clock, was established by certain of these same witnesses.

The trial judge told the jury: "There is some important testimony here which is offered in the nature of an alibi. In other words, these respectable women and men have taken the stand to testify that Kennedy and James could not have had this interview about the time it is said to have occurred because of these evenings that Mr. Arnold spent with his relatives, and they account for his actions, if the testimony is correct, on the three or four evenings. I am not sure whether Mr. Kennedy fixed the exact time of his visit there or not, whether it was on a particular day or two or three days. That is for you to say, gentlemen, as you heard the testimony, and I have already cautioned you to rely upon your own recollection of what these witnesses testified to, and not what I tell you."

Kennedy's evidence was that the conspiracy was formed on the 21st or 22d of March, 1935, at Arnold's apartment, and alone placed him there.

In Reavis v. U. S., 10 Cir., 93 F.2d 307, it is said: "But it further appears that defendant's counsel in making his objection stated that defendant's testimony to establish an alibi was a defense to the charges against him. Viewed in that way it alone would be a complete and absolute defense, if established to the satisfaction of the jury; or if considered in connection with the other facts and circumstances it might have raised in the minds of the jury a reasonable doubt entitling the defendant to an acquittal. The jury should have been so instructed," and authorities there cited.

The court in the instant case did not instruct the jury as to the effect of a proved or established alibi, but no exception was reserved on account of such omission.

Arnold's general reputation was testified to as being good by Mr. Olson, manager and director of the Denver branch of the Federal Reserve Bank, who had known him since 1922, and also by Nate Warren, of Fort Collins, president of the First National Bank there, and livestock dealer and grower.

Other witnesses joined in attesting to his good character.

Counsel for Arnold requested the following instruction: "If you believe from the evidence that at the time this charge was made against the defendant Oliver Arnold (that) he was a man of good character you should take such good character into consideration in passing upon the question of his guilt or innocence, for a man of good character is less likely to commit a crime than a man whose character is not good.

"If upon consideration of all the evidence, including that touching upon his character, you entertain a reasonable doubt as to whether the defendant Oliver Arnold is guilty of the offense with which he is charged in the indictment you should acquit him."

This being refused and exceptions saved, the court in his general charge instructed the jury: "There is also evidence here, gentlemen, of a nature called character evidence. Certain gentlemen living in this community have taken the witness stand and testified Mr. Arnold has borne a good reputation in this community. That is competent evidence and must be considered by you along with all the other evidence. It may be sufficient with the other evidence to raise a presumption of innocence in their

favor, because the law presumes that a man who has established a reputation for honesty and integrity in the community in which he lives is not so likely to violate the law as a man who has not built up such a reputation."

The court had already told the jury in his instructions that: "Every defendant in this court starts with the presumption of innocence in his favor, and that presumption lasts throughout the trial until overcome by the government by its evidence. He is presumed to be innocent until proven guilty, and if you have a reasonable doubt as to any material fact that is necessary to constitute the crime here charged, it is your duty to give the defendant the benefit of the doubt and find him not guilty."

■ Evidence of the good character of the defendant in a criminal case may be considered in connection with the other evidence to create a reasonable doubt of his guilt. Edgington v. United States, 164 U. S. 361, 17 S.Ct. 72, 41 L.Ed. 467.

The indictment limits the conspiracy to the three particular bonds. Kennedy's statement was that the conspiracy was to handle through the Denver National Bank "about ten thousand dollars of the bonds at a time on any one day" and that these stolen bonds would be put in the reserves of the bank and not sold at that time.

The evidence on the part of Austin J. Baird, assistant cashier of the bank, as well as Van Dervort, its trust officer, and Perkins, an assistant cashier, was that neither the appellant, Oliver Arnold, nor Perkins, had any access to the reserves of the bank. Perkins was in no manner charged with complicity in the conspiracy by the government.

Baird testified: "I am custodian of the bonds and stocks of the bank. They are kept in steel boxes with two keys under dual control. I have one of the keys and auditing department the other and the boxes can only be opened through myself and the auditing department. Their contents constitute the reserves of the bank. Oliver Arnold had no access to these boxes. They can only be opened on an order from the purchase and sales department which is in charge of Mr. Van Dervort. * * * Arnold did not have a thing to do with the reserves of the bank. He was not enabled in any way to draw out any of the bonds and substitute any other bonds for them, nor could Mr. Perkins."

Baird was corroborated by Van Dervort, who said it was he "and no one else" who "bought or sold bonds for the bank" in their investments. Van Dervort said: "Mr. Baird and the auditing department of the bank have custody of the bonds and securities of the bank. They had to come to me before any bonds could be taken from or added to the reserve."

Van Dervort stated to his knowledge Oliver Arnold had no keys to the reserve boxes, or any access to them under the rules of the bank, and that there was no way he could have access to them without coming to him (Van Dervort), he having entire charge of the purchase and sale of these bonds, and that Perkins had nothing to do with it and neither Arnold nor Perkins purchased any bonds for the account of the bank.

Kennedy explained that a few days after the sale of the three bonds, Arnold met him on the street and told him that a different arrangement would have to be made in the future as a letter of thanks had been mailed out to Mr. Griffin, which having been returned as undelivered to the bank, William Edwards, assistant cashier, who handled the bonds or securities for the bank, had asked him about Griffin, but said Edwards, assistant cashier, under direct examination by the prosecuting attorney, testified as follows:

"The bank was not engaged in the general business of buying stocks and bonds, but simply as an accommodation to a customer through a broker and we never bought them outright at any time in any case.

"We would take a customer's order to either buy or sell and then place it with a broker. * * *"

"If a man came in and opened a nice account we might mail a letter of thanks to him. If he deposited $100,000 we would send him a letter of thanks. If we sold a $100.00 bond for him we would not send him a letter."

Arnold also denied that he made any such statement to Kennedy.

According to John Edwards, in further contact with Kennedy, he discovered fabrication in the assertion as to Kennedy's being a bank clerk, when Kennedy "just gave an expressive shrug and said 'well, let's continue the discussion.'" Kennedy stated to said accomplice, John Edwards, one of the government's witnesses, so John Edwards

swore for the government during the trial, that "he had a contact who between twelve and twelve-thirty p. m. had access to the vaults of that bank, and that its government reserve amounted to $12,000,000.00 * * * that their method of disposing of these bonds within the bank itself was for this contact to withdraw a certain amount of bonds, the specified amount was to be turned over from their government reserve, and in their place substitute these hot bonds." Kennedy further said to John Edwards "that in any one period of not more than thirty days they could dispose of $90,000.00 worth in amounts of $10,000.00 each" in this manner, but the record discloses all of that to be false.

In talking to said Edwards, if he referred to Arnold as his contact, as to the bank reserves, under the undisputed evidence of this record, Arnold had no access whatever to said bank reserves.

Kennedy, after his release on bond before indictment, sought out Arnold, and in the presence of Mr. Cherrill, a rancher and livestock dealer who then was with Arnold, said: "I am Hap Kennedy. * * * I understand you are the man who is indicted with me and I want to meet you. I don't know you and I wanted to see what you looked like, and I didn't even know where you lived when I called you over the telephone so I looked it up," and that he had never been in Oliver Arnold's apartment, didn't know him, never having been there with anybody at any time, and didn't know Mr. Perkins.

Kennedy admitted that he told Mr. Van Cise, one of counsel for appellant, that he didn't know Mr. Arnold, but explained that this false statement was made at the request of Arnold. This is not only denied by Arnold but also contradicted by Cherrill.

Kennedy, after leaving the office of Mr. Van Cise (the attorney for Arnold) on May 28, 1936, telephoned Arnold, who remained in Van Cise's office, seeking again to contact him. Arnold, on advice of his attorney, had refused to talk, but upon Kennedy's insistent request and under later advice of his attorney, he called him over the phone. The conversation was taken down verbatim over a telephone extension by a stenographer.

The government makes no attack upon the notes of this stenographer, the court saying: "In my opinion there is no dispute but what her statement of that testimony was correct." But Kennedy denied some of the statements made by him in that conversation when he was interrogated relative thereto.

The evidence of the postal inspectors for the government was that Kennedy had signed a statement to them on May 8, 1936 (over two weeks before this telephone conversation), not disclosing its contents or whether appellant was implicated therein. Kennedy, when pressed on cross-examination, admitted he had given them the signed statement, it not being produced or introduced in evidence. In this conversation over the phone, Arnold told him that he had talked further with his attorney, Mr. Van Cise, who advised him to call Kennedy as he had requested, and asked Kennedy to tell him over the phone what he desired to say, but this Kennedy refused to do, stating "that is clear out of the question." Kennedy, as shown by this record made by the stenographer, stated that appellant's lawyer, Van Cise, was "all wet in some of his things, a good lawyer and all that, but some things he don't understand. I have had some awful things (over at the Post Office) shot at me, and I want to tell you in regard to them but I won't talk to him," and Arnold, in this conversation, told Kennedy that he was to abide by his attorney's wishes, and if Kennedy was to talk to anybody to talk to his attorney, Van Cise, and Kennedy also stated at that time that: "I would like to speak to you about Mr. Perkins also. * * * I don't know him; have not met him. * * * I have got to get straightened up on my bond, see, and raise some money. * * * If I give a statement I would be out of it. * * *" and that he had made no statement, and: "I have got to see you today if I see you."

Then Arnold again suggested that he talk with Mr. Van Cise, his attorney, when Kennedy said: "No, I won't talk to him. I don't like to tell another man my business that he isn't interested in. * * *"

Arnold then asked him: "Where would I come in on the deal? I never talked to you until the other day and never had any business dealings with you."

And Kennedy replied: "Well, I want to talk to you about things that will be of interest to you that I can't talk to him (Van Cise) about."

Mooney, an acquaintance with Arnold's son, testified that for that reason he went to Arnold, after he was charged with this

offense, and offered without charge to help him any way he could, he being a private detective. And that then he got in communication with Kennedy about October 30, 1936, having a conversation with Kennedy in which he stated to Kennedy: "I learned since seeing you last night that you are a government witness in this case." And Kennedy replied: "I couldn't be a witness for Whiskers, but I am keeping these birds guessing, and the banker will go for two to five grand before this is over." And then he said to Kennedy: "You must have something on the banker." And Kennedy replied: "Well, you know where there is money that is the place to hang your hat. You just have to use your bean, and before this is over, I will be the smart guy."

Arnold's attorney requested the court to instruct the jury as follows, saving an exception to its refusal: "An accomplice is defined to be one who confesses his participation in the commission of a crime. It is a settled rule in this country that even accomplices in the commission of a crime are competent witnesses, and the government has the right to use their testimony and the jury to consider it. The testimony of accomplices, however, is to be received with caution and weighed with great care, and while it is true that a jury may convict on such testimony alone, yet the jury should not rely on it unsupported for a conviction unless it produces in their minds a positive conviction of its truth."

In Lett v. United States, 8 Cir., 15 F.2d 686, 689, the following instruction was refused: "You are instructed that by the testimony of Josephine West she has confessed to the commission of a felony against the laws of the United States, in the transaction which she says has occurred. That makes her an accomplice, and her testimony must be viewed as such. You must examine it most cautiously, and, unless you are convinced beyond a reasonable doubt that, in considering all her motives in this case, her testimony is true." And the court (Van Valkenburg, Booth, and Phillips sitting), opinion by Van Valkenburg, said:

"We think the refusal, under the circumstances of this case, was reversible error, unless the substance was covered by the language of the charge given. * * *

"Ordinarily the failure of a court to charge that the testimony of an accomplice should be received with great caution is not assignable as error, in the absence of a request so to charge. * * * But it is the better practice so to instruct in any event, and a refusal to do so, when requested, is error. * * * We think the instruction asked was a proper one under the circumstances of this case. Ordinarily the requirement that the jury should be convinced beyond a reasonable doubt that the testimony of the accomplice is true would be objectionable, and would warrant refusal; but in the instant case proof of the sale depended entirely upon the testimony of Josephine West, and unless the jury believed that testimony beyond a reasonable doubt they could not properly return a verdict of conviction.

"The error committed in refusing this instruction was emphasized and aggravated by the charge of the court, to which error is assigned. In that charge, instead of advising the jury to exercise caution in receiving the testimony of the witness Josephine West, the trial judge fortified that testimony by announcing, in substance, his belief in its truth. While this action of the court would have been proper under ordinary circumstances, it is subject to criticism, in view of the refusal to instruct as requested, and of the character of the witness, as disclosed by the testimony."

Webster's New International Dictionary defines "caution" as:

"1. To furnish with a caution or proviso; to qualify by a saving clause (Obs. or Scots law).

"2. To give notice of danger to; to warn; to exhort (one) to take heed.

"'You cautioned me against their charms.—Swift'."

"To caution oneself to take heed. Syn. See Warn."

Same authority defines "care": "To cause to have care; to trouble; to care for; to regard."

The evidence of Kennedy was directly contradicted in part by the accomplice and also refuted by evidence of officers of the Denver National Bank, who testified that Arnold had no access whatever to the bank's reserves, and positively challenged by the four "respectable women and men" whose evidence was that Arnold was not in his apartment at the time claimed by Kennedy, on either March 21st or March 22d, or on March 20th or March 23d.

Kennedy, an admitted accomplice, on the witness stand, interrogated by the Unit-

ed States Attorney, admitted his prior conviction of a felony and that he had gone under aliases at different times.

On cross-examination, interrogated by the appellant's counsel as to what felony he had been convicted, on objection by the United States Attorney, the court sustained same, exceptions saved, and information denied to appellant as to what felony.

John Edwards, an admitted accomplice, also on the witness stand, interrogated by the United States Attorney, admitted that he had been convicted of a felony, and on cross-examination, interrogated by counsel for appellant as to what felony he had been convicted, objection made by the United States Attorney was sustained by the court, exceptions saved, and appellant denied information as to the nature of the felony.

█ A reasonably full cross-examination of a witness upon the subjects of his examination in chief is the right, not the mere privilege, of the party against whom he is called, and as a rule, a denial of this right is a prejudicial error. It is only after the right has been substantially and fairly exercised that the allowance of cross-examination becomes discretionary. Cossack v. U. S., 9 Cir., 63 F.2d 511.

█ Whether such conviction of each of the two witnesses, who voluntarily admitted on the witness stand at the instance of the United States Attorney that they had been convicted of a felony, was such an infamous crime as perjury, forgery, larceny, or robbery, or other felony involving moral turpitude, the inherent character of which showed mental and moral depravity, the ruling of the trial court prevented such fact being brought out on cross-examination to enable the jury to properly weigh the evidence, the denial of which was prejudicial error. Coulston v. U. S., 10 Cir., 51 F.2d 178; Yoder v. U. S., 10 Cir., 71 F.2d 85; Scaffidi v. U. S., 1 Cir., 37 F.2d 203; Moyer v. U. S., 9 Cir., 78 F.2d 624; Williams v. U. S., 8 Cir., 3 F.2d 129, 41 A.L.R. 328; Dahly v. U. S., 8 Cir., 50 F.2d 37; Mansbach v. U. S., 3 Cir., 11 F.2d 221; Alford v. U. S., 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624; In re Bartos, 8 Cir., 19 F.2d 722; Lee Kwong Nom et al. v. U. S., 2 Cir., 20 F.2d 470; Lawrence v. U. S., 8 Cir., 18 F.2d 407; Weisflog et al. v. U. S., 8 Cir., 291 F. 339; Hendricks v. People, 78 Colo. 264, 241 P. 734; Davis v. People, 77 Colo. 546, 238 P. 25; State v. Green, 167 Wash. 266, 9 P.2d 62; State v. Steele, 150

Wash. 466, 273 P. 742; 40 Cyc. 2610; Note, 103 A.L.R., Annotated, 362, and 70 C.J. 69.

As to cautioning the jury as to evidence of accomplices and proper instruction as to corroboration when the court did not caution the jury but referred to corroboration, without any admonition that one accomplice cannot corroborate another accomplice, in Freedman v. U. S., 3 Cir., 274 F. 603, 606, it was said:

"Trial judge charged the jury that it should give far greater scrutiny, care, and consideration to the testimony of accomplices than to that of witnesses of 'unsullied reputation,' for 'the source of that testimony, you see, is tainted.' He cautioned the jury that it should consider such testimony, and give to it the weight to which under all the circumstances it was entitled. He said:

" 'You are not merely to scrutinize it, but look at it from every angle. You are to test the question of its truth or falsity by every test which occurs to you that can be applied to it. If, after you have carefully considered it, the conviction rests upon your minds, with that degree of certainty which the law requires, that the testimony is true in its substantial features, and convinces you, as the phrase is, beyond a reasonable doubt of the guilt of the defendant, then you are not only justified, but it is your duty, even following testimony and evidence of that kind, to convict. * * * Do not throw this testimony out because it comes from a tainted source, but consider it, and, while you are considering it, remember from whom and what kind of witnesses the testimony comes.'

"The charge on this point appears to us to have been eminently fair and without error. While the jury should be cautioned to scrutinize most carefully the uncorroborated testimony of accomplices, yet, when this has been done, there is nothing which forbids the conviction of a defendant, at common law or in a federal court, on their uncorroborated testimony."

In Miller v. People, 92 Colo. 481, 22 P.2d 626, 630, it is said: "The court did not give a cautionary instruction concerning the testimony of an accomplice, and counsel for Miller did not request such an instruction. * * * Such an instruction warns the jury of the danger of convicting a defendant upon the uncorroborated testimony of an accomplice, and that the evidence of an

accomplice should be received with caution and regarded with suspicion."

In Hoffman v. People, 72 Colo. 552, 212 P. 848, 852, Judge Campbell speaking for the court, it is said: "The court properly instructed the jury to receive such testimony with great caution. Our decisions, ever since the Solander Case [2 Colo. 48, 67], are to the effect that one may be convicted upon the uncorroborated testimony of an accomplice, but that it must be clear and convincing, must be received with great caution, and show guilt beyond a reasonable doubt."

The trial court having been specifically requested in writing to caution the jury as to the weighing of the evidence of accomplices, it may be suggested that the court having told the jury to see whether it was corroborated in the following instruction which was a part of his general charge obviated any error: "Some of the evidence in this case is by what is known as accomplices, that is, by witnesses who came on the stand and admitted freely in this case that they were in this alleged unlawful enterprise which the law denounces. That is no reason why you cannot believe that testimony, but before you do believe it, it is your duty to scrutinize it very carefully gentlemen, examine it carefully, before you decide whether you are going to believe it, and see whether it is corroborated, whether it fits in with all the circumstances, whether it is reasonable in the light of all the evidence you have heard, and if after so considering it and scrutinizing it you still believe it, then you have a right to give it full credence or such credence as you may in your uncontrolled discretion decide."

That "necessary corroboration of an accomplice cannot come properly from another accomplice," and that corroboration must relate to some fact or facts connecting the accused with the act of guilt, it is not mentioned. The court's attention was directed thereto by request of the following instruction, exception being saved to its refusal: "In determining whether or not the testimony of a witness whom you find to be an accomplice has been corroborated you must not rely upon the testimony of another witness whom likewise you find is an accomplice. Corroboration in law of an accomplice cannot come from the testimony of another who likewise is an accomplice."

In Jones v. Commonwealth, 111 Va. 862, 69 S.E. 953: The general rule is that the testimony of one accomplice cannot be accepted as sufficient corroboration of the testimony of another. See also authorities therein cited.

In U. S. v. Hinz, C.C., 35 F. 272, at the bottom of page 278, it is said: "So, also, 'if two or more accomplices are produced as witnesses, they are deemed not to corroborate each other; but the same rule is applied, and the same confirmation required, as if there were but one.' 1 Greenl.Ev. § 381."

See, also, the Whiskey Cases, U. S. v. Ford, 99 U.S. 594, 603, 25 L.Ed. 399, and 16 C.J. 710, note 5.

In Sykes v. United States, 8 Cir., 204 F. 909, 912, the late Circuit Judge Water H. Sanborn said:

"Wharton in the ninth edition of his work on Criminal Evidence, in § 442, says:

" 'The corroboration requisite to validate the testimony of an alleged accomplice should be to the person of the accused. Any other corroboration would be delusive, since, if corroboration in matters not connecting the accused with the offense were enough, a party, who on the case against him would have no hope of an escape, could, by his mere oath, transfer to another the conviction hanging over himself.'

"A demonstration by reason and authority that this is the just and rational rule may be found in State v. Chyo Chiagk, 92 Mo. [395], 415, 417, 4 S.W. 704. To the same effect are United States v. Ybanez (C.C.) 53 F. 536, 540; Commonwealth v. Hayes, 140 Mass. 366, 369 [5 N.E. 264]; Commonwealth v. Holmes, 127 Mass. 424, 34 Am.Rep. 391; McNeally v. State, 5 Wyo. 59, 68, 36 P. 824. In the case last cited an accomplice stated that he and the defendant, McNeally, killed a cow belonging to another, and hid the brands and the hide at a certain place near McNeally's ranch, and he went with the officers where he testified they were hidden, and they there found them. The Supreme Court of Wyoming held that the finding of the brands, and the hide where the accomplice testified they were was not corroborative of the testimony of the accomplice as to the guilt of the defendant."

The contention of the government here that the failure of James to testify operated as corroboration of Kennedy and the other accomplices is not well founded. Heitler v. United States, 7 Cir., 244 F. 140,

and Wolfson v. United States, 5 Cir., 101 F. 430.

Act of Congress March 16, 1878, entitled "An act to make persons charged with crimes and offences competent witnesses in the United States and Territorial Courts. * * * That in the trial of all indictments, informations, complaints, and other proceedings against persons charged with the commission of crimes, offences, and misdemeanors, in the United States courts, Territorial Courts, and courts-martial, and courts of inquiry, in any State or Territory, including the District of Columbia, the person so charged shall, at his own request but not otherwise, be a competent witness. And his failure to make such request shall not create any presumption against him." Act March 16, 1878, 20 Stat. 30, c. 37, 28 U.S. C.A. § 632.

Each defendant in this action, including those who pleaded guilty as well as those who went to trial on pleas of not guilty, was represented by a different attorney.

Neither did the defendants McBride and West (two other codefendants who went to trial) take the witness stand, nor was any evidence of any character whatever introduced to the effect that McBride, or James, or Kennedy, or John Edwards, or Clifton, or West was ever present when Arnold, at any time, was a participant, other than in the regular discharge of his duties at the bank, except as testified by Kennedy as to the meeting at Arnold's apartment on March 21 or 22, 1935, and other matters testified to by Kennedy.

Neither did the trial court tell the jury to receive the accomplice's testimony with caution, nor inform them that one accomplice's evidence was not sufficient corroboration of that of another accomplice, nor advise them what was meant by him as to "corroborating evidence," but in connection therewith, directed the jury's attention to facts admittedly true which did not directly connect the defendant with guilty knowledge of the stolen character of the bonds or of any alleged scheme by him to receive or conceal them with such guilty knowledge. Sykes v. U. S., supra.

The evidence shows that Ralph Clifton, John Edwards, and Kennedy, the three confessed accomplices who entered pleas of guilty, assembled at least twice in the lobby of the First National Bank, one of the greatest banks in the Rocky Mountain region, with a fine personnel of officers.

At the time when they assembled there, after the $714.79 was received by them as the proceeds of the sale of the three bonds, they repaired to the toilet to divide the money.

These criminals who were so smart and adept as to assemble in the lobby of said bank without exciting suspicion had the same opportunity as to the Denver National Bank, which was on the opposite side of the street, not only to know its officers by sight but also to understand when each went to lunch, and it is not presuming too much to conclude that they knew where Arnold would be at such time and what his then apparent duties were in the bank.

As to Arnold, the record shows that he frequently, as a part of his duties, presented parties to the officers who handled the sale and purchase of bonds or such matters, and if such was known, why would Kennedy, with such information, phone in advance to know if the way was open? He could have gone into the lobby of the Denver National Bank and, had Arnold not been there, have gone out and excited no suspicion, but knowing that such were the surroundings and conditions, without any preconcert with Arnold, could have phoned from a Chevrolet plant, stating that a party was coming up to present some bonds to be sold and then bring them up himself, thereby preventing Arnold from suspecting him.

In summing up, the court nowhere mentioned the fact that Arnold had no access to the bank's reserves, that the $10,000 per day in bonds for presentation never materialized, without any explanation, only three bonds in the principal sum of $700 being presented for handling, and that the alleged statement of Arnold about the writing of the letter of thanks being returned, was denied, not only by him, but also in effect by an assistant cashier of the bank (William Edwards), and in stating to the jury the matters worked out exactly as Kennedy said same would, accentuated the effect of accomplice Kennedy's evidence.

Exceptions were reserved as to such summing up, and to the omission of the court to properly caution or warn the jury as to their duty in weighing the evidence of accomplices.

The alleged offense resting practically upon the testimony of said accomplice, and considering the record as a whole, as herein set out in detail, the conclusion is reached that a new trial should be granted

to the appellant. Quercia v. United States, 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321, and Starr v. United States, 153 U.S. 614, 14 S.Ct. 919, 34 L.Ed. 841.

The judgment of the trial court is accordingly reversed and the case remanded for a new trial.

BRATTON, Circuit Judge (specially concurring).

In the trial of a criminal case, a witness may be asked for the purpose of impeachment whether he has been convicted of a felony, infamous crime, petit larceny, or other crime involving moral turpitude. And it is the general rule that if he answers in the affirmative the inquiry ends, but if he replies in the negative the record of such conviction may be introduced. Coulston v. United States, 10 Cir., 51 F.2d 178, and cases there cited. The precise and narrow question here is whether a witness who admits conviction may be asked on cross-examination to state the nature or name of the crime for which he was convicted.

Some crimes are regarded as more heinous than others. Some involve a greater degree of moral turpitude than others. The credibility of a witness may be more seriously affected by the conviction of one than of another. Where a witness merely admits conviction of a felony, it is manifestly impossible for the jury to correctly weigh his testimony and properly determine the weight which should be given it without knowing the nature or name of the crime. In order that the jury may have light instead of being required to act in darkness respecting a matter of such substance, some states have enacted statutes which expressly permit inquiry as to the name of the particular crime. People v. Chin Hane, 108 Cal. 597, 41 P. 697; People v. Eldridge, 147 Cal. 782, 82 P. 442; People v. Fouts, 61 Cal.App. 242, 214 P. 657; State v. Johnson, 76 Utah 84, 287 P. 909. And the inquiry has been sanctioned in the absence of an authorizing statute. Territory v. Chavez, 8 N.M. 528, 45 P. 1107; Hadley v. State, 25 Ariz. 23, 212 P. 458, 462. In the latter case it was said:

"The general rule, in the absence of a statute regulating the matter, when a defendant offers himself as a witness, is that it may be shown, either by the record or on cross-examination, that he has suffered previous conviction of a felony or felonies. Either method is permissible. Wigmore on Evidence, vol. 2, § 980; Commonwealth v. Walsh, 196 Mass. 369, 82 N.E. 19, 124 Am. St.Rep. 559, 13 Ann.Cas. 642, and notes 643 and 644.

"The record, which is the best evidence of a previous conviction, may always be introduced. It, of course, would show the nature of the crime. The defendant cannot, in anticipation of the exposition of his past in that particular, by testifying to it on his direct examination, prevent the prosecution from showing the nature of the crime of which he was previously convicted. Indeed, the weight of the evidence as a factor of impeachment depends upon the character of the crime involved in the previous conviction—as, whether it involved moral turpitude or was merely malum prohibitum."

Here appellant had been long engaged in the insurance and the banking business. There is no suggestion that he had ever been previously involved in the commission of a crime. His good reputation was clearly established and no effort was exerted to show the contrary. He denied specifically and categorically that James and Kennedy ever came to his apartment and talked with him; denied that he knew anything about the agreement which constituted the conspiracy; denied that he ever discussed it with anyone or became a party to it in any manner; and denied that he knew the bonds which were sold through the bank had been stolen. He testified that Kennedy came to the bank, gave the name of C. J. Griffin, and said that he had some bonds which he desired to sell; that appellant thereupon introduced him to an employee of the bank who handled transactions of that kind in the absence of a certain assistant cashier; and that the sale was conducted in the regular manner. Virtually all of the testimony tending to establish the conspiracy laid in the indictment came from admitted accomplices. Kennedy, one of the accomplices, was the only witness who testified that appellant was ever approached concerning the conspiracy or ever agreed to participate in it. Manifestly a sharp issue of veracity was presented which the jury was required to resolve at least in part by measuring the credibility of the witnesses, particularly that of Kennedy and appellant, and correctly weighing their testimony. While the cross-examination could not extend to collateral matters or intrude into the private affairs of the witnesses for capricious purposes, in view of the peculiar circumstances present in this case, it was

510

prejudicial error to deny appellant the right to ask Kennedy and Edwards on cross-examination the name of the felony for which each admitted conviction. Hadley v. State, supra.

In all other respects, I think the case was tried without error; and my concurrence in the reversal is therefore limited to the one ground.